James J. HUGHES, Sonia M. Hughes, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. C98–4502–WDB.

United States District Court, N.D. California.

Oct. 10, 2000.

James and Sonia Hughes, Mark P. Velez, Velez Law Firm, Concord, CA, for plaintiffs.

United States of America, Robert Mueller, III, United States Attorney, Gail Killefer, Chief, Civil Division, Abraham Simmons, Assistant U.S. Attorney, San Francisco, CA, for defendant.

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR WANT OF SUBJECT MATTER JURISDICTION

BRAZIL, United States Magistrate Judge.

### BACKGROUND

In the paragraphs that follow, we address the government's contention that the court lacks subject matter jurisdiction over the one remaining claim in this case. In that claim, Lieutenant James J. Hughes of the San Francisco Police Department alleges that the United States Navy breached a duty to warn him about a known hazard (a large depression on Perimeter Road) on the Naval Base at Treasure Island—and that as a result of that breach he suffered severe personal injuries when his motorcycle collided with the hazard.[1] According to the United States, the act or omission out of which plaintiff's claim arises, i.e., the decision not to post a warning about the alleged hazard, is immunized by the "discretionary function" exception to the Federal Torts Claims Act. 28 U.S.C. § 2680(a).

Plaintiffs contend that this motion is not properly before this court because earlier in the pretrial period, when the case was assigned to Chief Judge Patel, she considered and rejected the position advanced here by the government. Unsure that at that earlier juncture the record had been sufficiently developed on this issue, we permitted the United States to make additional evidentiary and legal submissions in support of its renewed motion.

Solely for purposes of ruling on this motion, we assumed, without purporting to decide, that Lt. Hughes, as he has alleged,

---

1. This lawsuit also includes a claim by Sonia M. Hughes, the Lieutenant's wife, for loss of consortium. Whether the United States is immune from Mrs. Hughes' claim depends entirely on whether the United States is immune from the claim by Lieutenant Hughes. For that reason, our analysis of the discretionary function issues focuses only on Lieutenant Hughes' claim.

could adduce evidence sufficient to prove, under the applicable substantive tort law of the State of California, that there was a hazard on defendant's property (a specific sizeable and deep depression on Perimeter Road), that defendant knew about the hazard or clearly should have known about it, that in the circumstances defendant had a duty to warn about the hazard and that that duty ran to plaintiff, that defendant breached that duty, and that that breach was a substantial factor in causing plaintiff to suffer injuries. Under California law, proof of these contentions would establish a claim against defendant if defendant were a private party. *E.g., Ann M. v. Pacific Plaza Shopping Ctr.,* 6 Cal.4th 666, 673, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993).

Defendant, however, is the United States. As the sovereign, the United States is immune from suits such as this except to the extent that it has waived that immunity. The United States contends that Congress preserved its immunity from the kind of claim pressed here when Congress adopted the "discretionary function" exception to the FTCA. For the reasons set forth below, we disagree.

### THE LEGAL CONTEXT

■ To set the appropriate context, we begin by identifying some of the fundamental principles that inform the development of the discretionary function doctrine. First, we point out that the doctrine exists within a larger framework—specifically, it exists within the Federal Torts Claims Act. The purpose of that Act, at the broadest level, is to make the federal government responsible in tort "under circumstances where ... a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Congress' broad goal was to provide access to redress when risk-generating conduct by government actors fell below socially acceptable norms and caused injury. Courts should not overlook this significant statutory purpose when construing the Act.

■ While pursuing this larger purpose, Congress was aware that creating an unlimited right to sue could threaten the capacity to govern—perhaps by over-exposing the public fisc, perhaps by unduly inhibiting the freedom government actors are presumed to need in order to develop public policy and in order to make and carry out the decisions that must be made and carried out if the people's business is to be responsibly pursued. It was to achieve this end that Congress adopted the discretionary function exception—the purpose of which, generally, "is to protect the ability of the government to proceed with decisionmaking in carrying out its unique and vital functions without 'second-guessing' by courts as to the appropriateness of its policy choices." *See, Faber v. United States,* 56 F.3d 1122, 1124 (9th Cir.1995) *quoting* H.R.Rep. No. 1015, 101st Cong.2d Sess. 134 (1991).

It is in this broad context that we address the issues presented by the United States' contention that it is immune from this suit. We must take care not to construe the exception so broadly that it swallows the Act of which it is a subpart. To do so would defeat Congress' purpose in enacting the Federal Torts Claims Act. Rather, we must strike the balance between the major competing policies in this arena where Congress wanted that balance struck—taking care to protect the government's capacity to engage in governmental decision-making (without fear, in that arena, of torts and courts)—while at the same time preserving in members of our society the right Congress conferred on them to be protected from harms caused by tortious acts by government actors who are not engaged in decision-making that warrants the label "governmental."

■ In November of 1999 Chief Judge Patel ruled definitively on the issue of whether the discretionary function exception applies to the Navy's decision about whether to *maintain* Perimeter Rd—but that decision is not the act or omission on which plaintiff bases his only pending

claim. Rather, the act or omission on which the pending claim is based is the Navy's alleged *failure to warn* Lt. Hughes about a specific known hazard on Perimeter Road. The pertinent authorities teach us that when deciding whether or not the discretionary function exception applies, we must examine separately each challenged act or omission. *Sutton v. United States,* 26 F.3d 903, 907 (9th Cir.1994), *citing Kennewick Irrigation Dist. v. United States,* 880 F.2d 1018, 1025 (9th. Cir. 1989). Stated differently, we must apply the pertinent legal test separately to each challenged act that might serve independently as a basis for liability. The wisdom of insisting on such separate analyses will become clear when, below, we see how different the analyses and outcomes are when we apply the second element of the test to the two different kinds of decisions the plaintiffs have sought, at various junctures in this litigation, to challenge: (1) the decision not to maintain the road, and (2) the decision not to post a warning about the hazard in which Lt. Hughes sustained his injury.

■ The authorities also teach us that our analysis, to be reliable, must be case and circumstance specific. *See, e.g., Shansky v. United States,* 164 F.3d 688, 693 (1st Cir.1999). We are in grave danger of legal error if we simply ask, out of fact-specific context, whether a particular kind of act or omission is immunized under the discretionary function exception. Instead, we must focus on the specific regulatory (legal/policy) and factual setting in which the act or omission allegedly occurred—and determine whether, in that setting, the act or omission in question is the kind that Congress intended to immunize under this doctrine.

The accuracy of this generalization is graphically illustrated when we examine the cases in which courts have considered whether the discretionary function exception immunizes decisions about whether and/or how to communicate warnings about potential hazards. These cases show us that the same kind of decision (*i.e.,* a decision about whether and/or how to warn of hazards) can be protected in some environments but not be protected in others. *Compare, e.g., Blackburn v. United States,* 100 F.3d 1426 (9th Cir.1996); *Valdez v. United States,* 56 F.3d 1177 (9th Cir.1995); *Childers v. United States,* 40 F.3d 973 (9th Cir.1994); *Lesoeur v. United States,* 21 F.3d 965 (9th Cir.1994); *with Faber,* 56 F.3d 1122; *Sutton,* 26 F.3d 903; *Summers v. United States,* 905 F.2d 1212 (9th Cir.1990); *Seyler v. United States,* 832 F.2d 120 (9th Cir.1987); *Cope v. United States,* 45 F.3d 445 (D.C.Cir.1995). Our task is to try to ascertain what makes the difference. To which factors or considerations should we attend when we try to distinguish protected from un-protected decisions of this kind? When we look carefully at the cases, we discover that each of the two elements of the applicable test has served as an independent source of different criteria for drawing this distinction.

## THE TWO ELEMENT DISCRETIONARY FUNCTION TEST: SUMMARY

■ The test we must apply is deceptively simple to articulate. To establish its entitlement to immunity under the discretionary function exception, the United States must prove both of two things: first, that the challenged act or omission "involves an element of judgment or choice," and, second, that the kind of judgment or choice that was involved is one of the kinds "that the discretionary function exception was designed to shield," *i.e.,* the kind of judgment or choice that would be "grounded in social, economic, and political policy." *Berkovitz v. United States,* 486 U.S. 531, 536–537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), *citing and quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). The court must focus on the nature of the act or omission, not on the status or capacity of the actor. *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. 2755. Similarly, the analysis does not turn on the

subjective intent of the decision-maker, or even on whether a decision was made (as a matter of historical fact), but on what the context shows the nature of the decision was to have been. *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

APPLICATION OF THE FIRST ELEMENT OF THE TEST TO THE DECISION NOT TO POST A WARNING

■■■■ Application of the first element of the test is relatively straightforward in the case at bar. In fact, plaintiff apparently concedes that the decision about whether to warn of the hazard that allegedly caused this accident involved "an element of judgment or choice." In other cases, the government has failed to satisfy this element of the test when it has been clear that the challenged act, omission or decision was the subject of a clear, specific mandate (usually by regulation)—a

mandate that instructed the governmental actor to follow a specified course or to respond in a specified manner to the circumstance that gave rise to the claim. The immunity is not available when the challenged conduct violates a mandate that was intended to leave the government actor with no meaningful room to exercise discretion.

The United States would not be able to satisfy this element of the test in the case at bar if a regulation or rule had directed the officers at Treasure Island to post warnings at potential road hazards, even on roads with restricted access, and if it was clear that the depression on Perimeter Road was a potential hazard. But plaintiff has pointed to no such regulation, rule or policy. In fact, we are not aware even of any general pronouncements on this subject (whether and how to warn of potential hazards) in the regulatory environment in which the decision to post no warning was made.[2] The regulatory silence on this sub-

---

**2.** Plaintiff directed our attention to only two regulatory provisions, neither of which was applicable in the circumstances that obtained at the time Lt. Hughes was involved in the accident that gave rise to this case. Both of these provisions appear in the "Base Realignment and Closure Facility Layaway And Caretaker Maintenance Standards" that were issued by the Chief of Naval Operations in the fall of 1994. *See,* Defendant's Exhibit 3, filed September 15, 2000.

Paragraph 1.a. of Section III of the Layaway Standards addresses the subject of blocking roads—but applies by its express terms only after "tenant activities have departed and portions of the base are inactivated." There is no dispute that the Navy had not ceased activities on Treasure Island, or departed from it, when Lt. Hughes' accident occurred. Moreover, this paragraph contains no guidance or directives at all about warnings about hazards.

The other provision to which plaintiff has pointed (paragraph 13. a. of Chapter 3, "Caretaker Maintenance Standards") appears in a chapter that applies, according to uncontradicted testimony, *only* when the base has been converted to "caretaker" status—a conversion that plaintiff concedes had not yet occurred when the events giving rise to the claim in issue occurred. There are two sentences in this section that might have had some bearing on the issues considered here *if*

the base had been converted to "caretaker" status. Those two sentences read: "All other roads and streets [those not required for daily public access] should be maintained only to permit safe passage at reasonable speeds. Markings, signs, and signals should not be maintained or renewed." Because the base was not in "Caretaker" status, these sentences were irrelevant to the decisions being challenged here.

But even if these sentences were relevant, there are two additional points that would undercut deeply any contention that because of this language the government could not satisfy the first element of the discretionary function test. First, the full context in which these sentences appear makes it clear that they were intended to be considered, and were considered by officers in the field, only as non-mandatory and general guidance. Officers in the field were expected to make site-specific judgments about the extent to which and the manner in which these guidelines should be followed. The "Standards" explicitly declare that what they provide is "guidance"—and explicitly acknowledge that officers in the field must make circumstance specific determinations about the matters as to which "guidance" is provided. See, e.g., paragraphs 1. and 3. of the "Introduction" to the Standards.

Second, nothing in these sentences expressly addresses the subject of warning about

ject necessarily left the officers in the field with discretion to decide whether to post warnings of possible hazards. It follows that the United States has satisfied the first element of the test.

## THE SECOND ELEMENT OF THE DISCRETIONARY FUNCTION TEST: EXPLORING ITS MEANING

 The second element of the test is much more difficult to understand. That fact stems in part from the inherent difficulty of drawing the line between (1) the kinds of acts or decisions that need to be immunized in order for government to perform its "'unique and vital functions,'" [3] and (2) the kinds of acts or decisions that could give rise to liability without creating any serious threat to the ability of the government to meet its essential responsibilities. While the decisions on the extreme ends of this spectrum are easy to categorize, there is a lengthy middle section in which it is not at all clear how (by what analytical method) we are to make the necessary distinction.

A related source of difficulty is the fact (acknowledged explicitly in *Shansky*, 164 F.3d at 693) that virtually every decision by a governmental actor that is within the course and scope of his or her governmental duties might be said to be "grounded [in some at least remote sense] in social, economic, and political policy." [4] If applied unrealistically, this element could immunize virtually all official government conduct—and thus could effectively eviscerate the Federal Torts Claims Act. Congress couldn't have intended that result (courts

cannot assume that Congress is in the business of making obviously false promises). As at least two United States Courts of Appeals have acknowledged, the fact that a particular act or decision has some remote roots in public policy, or could be traced through a distended or indirect route to some earlier policy decision, cannot be sufficient to shield that act with immunity. *See, Shansky,* 164 F.3d at 692–693; *Cope,* 45 F.3d at 448–449. Congress must have expected the courts to exercise some semantic restraint and common sense in this arena—to fashion approaches to drawing the necessary line that would not have the effect of insulating from suit virtually every negligent act by a federal employee that was not in violation of a specifically targeted directive.

Moreover, a literal and unrealistic interpretation of this second element would have the effect of collapsing the test, for all practical purposes, into a one element exercise. See, Cope, 45 F.3d at 449–450. In the vast majority of cases, only the first element would retain any analytical significance. Lower courts should be careful not to apply the test in a manner that so alters its fundamental character—especially when the Supreme Court, the source of the test, has had ample opportunity to make such a change explicitly but has chosen not to do so.

How are we to construe this second element so that it retains some real meaning but does not leave exposed the kinds of policy-based choices or judgments that Congress intended to protect? Stated differently, when we apply this second ele-

---

hazards. These provisions do not direct officers in the field to post warnings, or not to post warnings, about potential hazards. Nor do these provisions purport to identify the factors or matters that field officers should take into account when deciding whether to post warnings about known hazards. The reason for this silence is clear: these provisions were intended to address decisions about levels of maintenance, and not to guide or assist decision-making about whether and how to warn about hazards.

3. *See, Faber,* 56 F.3d at 1124 *quoting* H.R.Rep. No. 1015, 101st Cong.2d Sess. 134 (1991).

4. The one exception that the Supreme Court has clearly acknowledged consists of a governmental employee [presumably not directly engaged in law enforcement activity] operating her government vehicle in a negligent manner and causing an accident. *See, Gaubert,* 499 U.S. at 325 n. 7, 111 S.Ct. 1267.

ment, what analytical process will enable us to draw the line in a manner that is consistent with Congress' objectives? We have studied the authorities with this question in mind. Our answer follows.

At least in settings like we face in the case at bar, we think the court must focus on the relationship between the specific kind of decision that the plaintiff challenges (here the decision not to post warnings about a known and allegedly hazardous road condition) and the 'regulatory environment' in which that decision was made. By 'regulatory environment' we mean the constellation of statutes, official policy pronouncements, and duly promulgated rules and regulations within which the decision-maker functions. After identifying the specific kind of decision that is in issue, the court must examine the evidence about the regulatory environment to try to answer the following questions.

First, what are "the purposes that the regulatory scheme seeks to accomplish?" *Gaubert*, 499 U.S. at 325, n. 7, 111 S.Ct. 1267. Second, what are the "policies which led to the promulgation of the regulations?" *Id.*, at 324, 111 S.Ct. 1267. To make it clear that this second question does not have the same target of inquiry as the first question, we point out that what we are trying to identify through this second inquiry are the various policy considerations or factors or concerns that the people who crafted the regulatory environment took into account, gave some play to, or weighed and balanced when they went through the process of developing the rules, regulations or guidelines that make up the specific regulatory environment that is in issue. The third inquiry in this sequence, which can shed light on the first two, seeks to identify the "topics" or subjects that are addressed by the regulations or guidelines or statements of policy that form the setting in which the decision in issue is to be made. *Id.*

After completing this examination of the regulatory environment, the court turns its attention back to the specific kind of decision that the plaintiff challenges. Focusing on that decision, the court asks another series of questions. First, does the regulatory environment address the kind of decision that serves as the basis for the plaintiff's claim? Stated differently, are there rules, regulations, guidelines, or policy statements in the regulatory environment that offer direction about how (e.g., by identifying factors to consider, or priorities to ascribe, or analytical paths to follow) government actors should resolve the kind of issue that is the subject of the challenged decision?

Silence in the regulatory environment about the kind of decision that is being challenged would not necessarily mean that that decision could not have been grounded in public policy—not every kind of decision is the subject, at least expressly, of a statute, regulation, formally adopted policy or other kind of governmental pronouncement. For example, a decision by the President to send some of his staff overseas to help develop responses to an unforseen political crises might not be the subject of any meaningful regulations, but clearly would be informed by policy considerations.

On the other hand, the impulse to regulate has had more than seven decades of opportunity to express itself—with the result that a very large percentage of the conduct of government officials is cabined or guided, sometimes by vast and dense networks of policy and rule pronouncements. Because the policy makers and regulation writers have sought to address and constrain so much of what governmental actors may do, the fact that a particular challenged act or decision is not the subject of any rules or guidelines might tend to indicate that that act or decision was not grounded in public policy. At a minimum, it would be difficult to show that it was a kind of decision that the regulation writers anticipated—and thus it would be difficult to show that it was the kind of decision that the regulation writers expected offi-

cials in the field to make within the framework established by the regulations (e.g., by weighing the policy considerations that the authors of the regulations took into account and tried to prioritize or accommodate when they wrote the regulations).

Similarly, if the regulations did not address and offer guidance about the kind of decision that is in issue, it would be less likely that that kind of decision could be said to promote or "be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert,* 499 U.S. at 325, n. 7, 111 S.Ct. 1267. It follows that courts should demand a clearer showing that a challenged act or decision is the kind that would turn on consideration of "social, economic, and political policy" when the official's act or decision is not addressed in the pertinent regulatory setting—or when that act or decision can be said to be addressed in that setting only by oblique reference or indirect implication.

If, in contrast, the kind of decision that is challenged in the litigation was addressed in the regulatory environment within which the government official was working, and if the regulations confer discretion on the official when making the decision (as would have to be the case for the court to have proceeded to consideration of the second element in the discretionary function test), then "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. A challenger could overcome this presumption—but not easily.

In fact, the Supreme Court's acknowledgment of this strong presumption requires lower courts to be careful not to misapply the general notion that the government bears the burden of proving that the discretionary function exception immunizes a challenged decision. *Faber,* 56 F.3d at 1124. If the government proves that the challenged decision was the subject of pertinent regulations or policy guidelines, and that those regulations conferred discretion on officials in the field in making the decision, the presumption that the *Gaubert* court recognized would arise—thus placing a burden on the *plaintiff* to prove, apparently by the equivalent of clear and convincing evidence, that the discretionary function exception did *not* apply.

On the other hand, because the law clearly locates the overall burden of proof as to this immunity on the government, courts should resolve against the government doubts about whether the regulatory environment addresses the kind of decision that is in issue. In other words, the government should not be entitled to the benefit of this "strong presumption" unless the government first shows, with sufficient clarity, that the challenged act or decision was in fact discretionary within and "authorized by the regulation." *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267.

If the government makes a showing sufficient to trigger the presumption in its favor, what kinds of showings by a challenger might overcome the presumption? In theory, a challenger might show that the pertinent regulations were not the product of consideration of public policy— that the authors did not weigh or consider public policy when they were drafting the applicable rules or guidelines. If such a showing were made, it might follow that a decision "authorized by the regulation" would not have involved the consideration of public policy. But it seems unlikely in the extreme that a challenger could make the threshold showing that a body of regulations or guidelines was crafted without reference to social, economic, or political policies.

A more promising, but still difficult, line of attack would focus on the relationship between the kinds of policies that informed the crafting of the regulatory environment, on the one hand, and, on the other, the kinds of considerations that, realistically,

were likely to affect the particular kind of decision being challenged. The challenger's goal in this setting would be to show that even though the kind of decision in issue was in some sense anticipated by the regulations, there is a clear disconnect between the underlying policy purposes that shaped the regulatory environment and that decision.

The challenger might try to show, for example, that the challenged decision clearly was peripheral to pursuit of the purposes that underlay the regulatory scheme—and that it was foreseeable that that decision would be made by reference to practical considerations that had little or nothing to do with the values or policies on which the authors of the regulations had focused. Stated somewhat differently, the challenger would try to show that there were two different kinds of decisions that would be made by officials working in that particular policy environment: (1) those that were integral to the regulatory scheme and would contribute in some meaningful sense to attainment of the overall regulatory goals, and thus would be made by reference to the policies on which the regulatory regime were based, and (2) those subordinate or dependent decisions that might be necessary to set the stage for or to help execute the larger plans, but that would contribute only indirectly toward the larger ends and that foreseeably would be made by reference to considerations that were largely independent of the policies that had come into play when the purposes of the regulatory environment had been established and when the primary content of that environment was developed. Decisions in the latter category could not be said to be "grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267.

## APPLICATION OF THE SECOND ELEMENT OF THE TEST TO THE DECISION NOT TO POST A WARNING

 The kind of decision in issue here is about whether to post (or otherwise communicate) a warning about an allegedly hazardous condition on a restricted access roadway on a military base that was scheduled to be closed and turned over to civilian authorities.

As stipulated by the parties, the regulatory environment in which the officers made the decision that is challenged in this litigation consisted primarily of a series of statutes collectively referred to as BRACs (Defense Base Closure and Realignment Acts),[5] various provisions in the Code of Federal Regulations,[6] a *Base Reuse Implementation Manual* that was published by the Department of Defense in July of 1995,[7] and "Base Realignment and Closure Facility Layaway and Caretaker Maintenance Standards" that were promulgated by the Navy in September of 1994.[8]

The primary purposes that this regulatory regime sought to accomplish were: to reduce the burdens on taxpayers that had flowed from operating and maintaining military bases that were no longer essential to national security, to soften adverse economic and social impacts on communities in which bases would be closed, to facilitate socially constructive civilian uses of the closed bases (*e.g.*, as housing for the homeless and for economic redevelopment projects), and to manage the property in transition in a way that would minimize

---

**5.** *See, e.g.,* the Defense Base Closure and Realignment Act of 1990 (Part A of Title XXIX of Pub.L. 101–510), and amendments thereto in 1993 (focusing on Community Assistance) and in 1994 (focusing on Redevelopment and Homelessness Assistance).

**6.** *E.g.,* 32 C.F.R. pts. 90 and 91 (1995) (it appears parts 90 and 91 were in effect only through 1995); and 24 C.F.R. pt. 586 (1996) (it appears part 586 was adopted in 1996 and

was in effect in 1997, the year in which Lt. Hughes had the accident that is the subject of this litigation).

**7.** *See,* Defendant's Exhibit 2, filed September 15, 2000 (DoD 4165.66–M).

**8.** *See,* Defendant's Exhibit 3, filed September 15, 2000.

expenses incurred by the military authorities while not needlessly increasing the cost or difficulty of converting the property to its anticipated civilian uses.[9]

As these purposes suggest, a large number of values and concerns (public policy matters) came into play in the development of this regulatory environment, but the government has failed to establish that in that process the policy makers or the authors of the regulations considered or addressed questions about communicating warnings about potential hazards on roadways on the military properties. Even the much more generic topic of "safety" is not the subject of extensive attention in these regulations and guidelines.[10] So, as far as the evidence presented to us shows, there is no basis for inferring that the authors of the pertinent regulations thought at all about hazard warnings, let alone engaged in any policy balancing about issues related to hazard warnings.[11]

Nor have we seen any reason to believe that the authors of the regulations anticipated that an official who was working in the policy environment they had fashioned would attempt to balance the kinds of factors that they had taken into account in developing the regulations and guidelines

when that official went about deciding whether to post a warning about a possible road hazard. In sum, the policy makers left the officers in the field without any guidance at all on this kind of question— apparently expecting those officers to resolve such issues by reference to values or concerns independent of those that drove the formulation of the regulations.

The government has adduced no evidence about where an officer faced with this kind of issue would look for guidance or regulatory direction. Presented with no such evidence, we presume the officer would have recourse to common sense and to whatever generic training or instruction he may have received (*e.g.,* as an engineer) about how to determine levels of risk, the likely effectiveness of various kinds of possible hazard warnings, etc. But these speculations on our part cannot suffice to meet the government's burden of showing that the officer's decision was grounded in social, economic, or political policy.

Nor does the character of the decision itself suggest that it would be made, *in the specific setting we confront in the case at bar,* by balancing competing considerations worthy of being labeled "social, eco-

---

9. One might well expect decisions about whether to *maintain* roads on the military base to be informed by these kinds of policy considerations, but it is *not* the decision not to maintain Perimeter Road that is in issue here. The decision on which plaintiff's remaining claim turns is the decision not to post warnings about the pothole or depression in the road where plaintiff was injured. As discussed in the text, it is far from clear that that specific kind of decision would be informed by the policy considerations that shaped the regulatory environment.

10. One sentence in the *Base Reuse Implementation Manual* of 1995 declares that "Property improvements or alterations not necessary to protect public health and safety will not be made as part of military-funded protection and maintenance." *See,* Declaration of Mark P. Velez in Support of Plaintiffs' Opposition to Defendants' Counter–Motion for Summary Judgment, filed September 22, 1999 at Ex. 3, Section 6.3.3., at page 6–8 (December 1997 version of "BRIM"—which the parties seem

to agree is relevant even though dated after the events in issue here).

There is one additional provision in the regulations or guidelines that adverts to road safety—but it did not apply until a base was converted to "Caretaker" status—which had not happened when Lt. Hughes was injured. Moreover, that provision says nothing expressly about warnings about hazards. *See,* discussion note 2, *supra,* referring to Chapter 3, ¶ 13.a. of "Caretaker Maintenance Standards."

11. This important fact distinguishes this litigation from the cases in which it was clear that the authors of the pertinent regulations had identified the important public policy concerns that they expected officials in the field to balance (including esthetics, access to important public resources, preservation of valued properties, safety, etc.) when deciding whether and how to post warnings of known hazards. *See, e.g., Blackburn,* 100 F.3d 1426; and *Childers,* 40 F.3d 973.

nomic, and political policy." [12] This is not a case involving a national park, a national monument, or a national forest in which decisions about whether and how to communicate warnings foreseeably involve balancing competing interests or values with substantial public policy dimensions. *See, Blackburn,* 100 F.3d 1426, and cases discussed in that opinion. In those cases, the authors of the regulatory environment identified the pertinent public policy concerns (*e.g.,* preservation of irreplaceable natural resources or historical sites, access to recreational and esthetic opportunities,[13] safety, budgetary prioritization, etc.) and directed the officials in the field to balance those substantial concerns when making site-specific decisions about communicating warnings. Nor is this a case in which the regulations make it one of the primary responsibilities of the 'regulated' officials (*e.g.,* Coast Guard officers) to promote safety in an environment understood to contain hazards (federally controlled waterways) by making judgments about which hazards warrant warnings and how such warnings should be communicated. *See, Sutton,* 26 F.3d 903.

Rather, in the setting we confront, there is no evidentiary support for an inference that the people who developed the regulations expected the regulations to offer any guidance to officials trying to make decisions about warnings—or expected such decisions to be made by balancing the policy considerations that informed the shaping of the regulations. In fact, the regulatory environment as presented to us does not suggest that decisions about warnings would be based on any special or setting-specific *public policy* factors. Even budgetary constraints would not seem to play a significant role in such decisions—because the cost of posting warnings was very modest and there were relatively few similarly situated roads (restricted access, intended for vehicular use by only a limited universe of authorized persons). The government presented no evidence that spending the money necessary to post warnings on similarly situated roads would have compromised the government's ability to secure any of the larger policy ends that were contemplated in the regulatory environment.

We conclude that the pertinent policy makers expected decisions about hazard warnings to be made on the same rather narrow, quasi-scientific or quasi-technical bases that such decisions would be made in most other settings.[14] The pertinent con-

**12.** *See, Faber,* 56 F.3d at 1124, where the Court stated: "It is clear that the question of what constitutes adequate warning is not typically related to broad public policy."

**13.** The government has not suggested that esthetic or environmental considerations played any role in the decision about whether to post warnings on Perimeter Road—a road to which the government intended to restrict access.

**14.** *See, e.g., Faber,* 56 F.3d at 1124–25, where the court declared: "It is clear that the question of what constitutes adequate warning is not typically related to broad public policy." Subsequently, in the same opinion, the court insisted that "a failure to warn involves considerations of safety, not public policy. It would be wrong to apply the discretionary function exception in a case where a low-level government employee made a judgment not to post a warning sign, or to erect a guardrail, or to make a path safer. Such a judgment would be no different than a judgment made by a private individual not to take certain measures to ensure the safety of visitors.... [I]n cases where the government has allegedly failed to warn, the use of the discretionary function exception must be limited to those unusual situations where the government was required to engage in broad, policy-making activities or to consider unique social, economic and political circumstances in the course of making judgments related to safety."

In support of these views, the *Faber* court cited *Lesoeur v. United States,* 21 F.3d 965, 970 (9th Cir.1994), where a different panel of judges had pointed out that "a failure to warn falls within the discretionary function exception only if it implicates political or economic policy considerations. In the usual case, the failure to warn involves only 'safety considerations under an established policy, rather than the balancing of competing policy considerations.'" *Citing, Summers,* 905 F.2d at 1215.

siderations would include the likelihood of an accident occurring, the severity of the likely consequences if an accident did occur, the likely effectiveness of warnings, etc. It would distort semantics and common sense, and it would eviscerate the FTCA, to hold that in this regulatory setting such matters constitute "social, economic and political policy."

 The United States contends that we should not de-couple the decision to restrict access to the road and then not to maintain it from the decision not to post warnings. In the specific setting this case presents, however, the law requires us to de-couple these decisions. This follows for two reasons. First, as we noted above, authority in this Circuit requires us to apply the two element discretionary function analysis separately to each alleged act or omission that could independently support a right to relief. *Sutton*, 26 F.3d at 907, citing *Kennewick*, 880 F.2d at 1025. *Cf.*, *ARA Leisure Services v. United States*, 831 F.2d 193 (9th Cir.1987).

 Second, these two matters (whether to maintain and whether to warn) are de-coupled by the pertinent regulatory regime. While the regulations offer substantial guidance for decisions about whether to maintain, they offer no guidance about whether to warn. That de-facto de-coupling is consistent with our finding that, unlike decisions about maintenance, which were to be rooted in and guided by the regulations, decisions about warnings were not expected to be "grounded in the policy of the regulatory regime." *Gaubert*, 499

U.S. at 325, 111 S.Ct. 1267. When the regulators de-couple these matters, courts should re-couple them only on compelling showings. No such showing has been made here.

In sum, we hold that the United States has failed to prove that, in the specific setting of this case, the kind of decision on which plaintiff's claim turns, *i.e.*, the decision not to post warnings about potential hazards on restricted access roads on a military base that was scheduled to be turned over to civilian authorities, was the kind of decision that would be "grounded in social, economic, and political policy." Having failed to make that showing, the United States has failed to establish that this was the kind of decision that the discretionary function exception to the Federal Torts Claims Act was intended to protect. *Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660. We therefore DENY the motion by the United States to dismiss plaintiff's claim for want of subject matter jurisdiction.

IT IS SO ORDERED.

As discussed in the text, above, in "failure to warn" cases the factor that is most likely to persuade the Court of Appeals for this Circuit that it has before it one of those 'unusual situations' that gives the government access to this jurisdictional defense is a showing that in crafting the pertinent regulatory environment the policy makers addressed the issue of whether and how to communicate warnings about hazards and then conferred on officials in the field discretion to make decisions about whether and how to communicate warnings by balancing the same kinds of policy considerations that informed the shaping of the regulations. But absent such a showing, a failure to warn claim would be considered a "usual case" by the Court of Appeals—meaning that the discretionary function exception would not apply.