**Thomas P. LOUGHLIN,
et al., Plaintiffs,**

v.

**UNITED STATES of America,
et al., Defendants.**

**No. CIV.A.02–0152 ESH.**

United States District Court,
District of Columbia.

Sept. 10, 2003.

Patrick Michael Regan, Regan, Halperin & Long, P.L.L.C., Washington, DC, for plaintiffs.

J. Patrick, Glynn, David S. Fishback, S. Michael Scadron, Christina Humway, Jane Mahoney, Steven M. Talson, Jason Patil, Theodore Hunt, United States Department of Justice, Thomas M. Ray, Joel E. Wilson, Claes H. Lewenhaupt, U.S. Attorney's Office, Mitchell E. Zamoff, Hogan & Hartson, L.L.P., Kirby D. Behre, Paul, Hastings, Janofsky & Walker, L.L.P., J.

Douglas Baldridge, Howrey Simon Arnold & White, LLP, Washington, DC, for defendants/cross–claimants/cross–defendants.

## MEMORANDUM OPINION

HUVELLE, District Judge.

During the First World War, the United States Army began an intensive effort to develop and test new instruments of war, including chemical weapons. A significant portion of this research was conducted at the American University Experiment Station (AUES) in the District of Columbia's Spring Valley neighborhood. Although the Army vacated AUES soon after the war ended, it left behind a buried cache of chemical munitions and various other toxic materials associated with gas warfare. For decades the residents of Spring Valley remained unaware that these materials lay submerged beneath their homes; indeed, it was not until the mid–1980s that American University launched the first investigation into the issue. Since then, both private landowners and the federal government have conducted a barrage of tests to uncover the scope of the problem, as well as the ongoing threat that the buried munitions may pose to human health and the natural environment. These events have also triggered a series of lawsuits that include an array of claims, counterclaims, and cross-claims against litigants both private and governmental.[1] Despite this procedural complexity, however, the legal question now before the Court is straightforward: whether the claims made

---

1. Four separate actions have been filed: *Loughlin v. United States*, Civil Action No. 02–0152; *Gillum v. Am. Univ.*, Civil Action No. 02–0294; *Saum v. Am. Univ.*, Civil Action No. 02–0349; and *Jach v. Am. Univ.*, Civil Action No. 02–1580. On February 20, 2003, this Court dismissed the *Jach* case for lack of subject-matter jurisdiction. *See Jach v. Am. Univ.*, 245 F.Supp.2d 110 (D.D.C.2003). While the other three suits are still pending, the present Memorandum Opinion resolves all claims that have been asserted against the federal government in these actions.

against the federal government under the Federal Tort Claims Act (FTCA) are barred by that statute's discretionary function exception, 28 U.S.C. § 2680(a). These claims are based on three discrete sets of events: (1) the Army's allegedly negligent disposal, storage, and handling of chemical weapons (including their burial) during the time that AUES was operational; (2) the Army's alleged failure, from World War I until the present, to issue adequate warnings about the existence and danger of buried munitions in Spring Valley; and (3) the government's allegedly negligent removal and clean-up efforts once those munitions were detected.

In a previous order issued in these cases, the Court denied the government's motions to dismiss in part, but specifically reserved judgment on the discretionary function argument. *See Loughlin v. United States*, 230 F.Supp.2d 26, 29 n. 3 (D.D.C.2002). The Court then gave the claimants an opportunity to conduct discovery regarding the existence of rules, regulations, or directives that might bear on whether the exception applies here.[2] Now that such discovery has been completed, the parties have filed supplemental memoranda addressing the issue. After considering these arguments, and for the reasons set forth below, the Court concludes that the discretionary function exception does apply in these cases, and will therefore grant the government's motions to dismiss.

## BACKGROUND

The military's presence in Spring Valley began when the Board of Trustees of American University (AU) wrote a letter to President Woodrow Wilson in April 1917 offering the use of their 92–acre campus to the government in support of the ongoing war effort. After accepting the offer, the Army leased the grounds from the University and gave its Corps of Engineers ("Corps") exclusive control over the property, which became known as Camp American University. (The name was subsequently changed to Camp Leach.) Later that year, the federal government's Bureau of Mines established AUES in order to consolidate its chemical weapons research, which had theretofore been conducted at locations scattered around the country. Approximately 600 scientists and engineers came to be stationed on the campus, where they worked to develop and test numerous aspects of chemical warfare. Civilian control of the research station did not last, however, and on June 25, 1918, President Wilson formally transferred AUES from the Bureau of Mines to the War Department, specifically to its newly formed Gas Service.[3]

AUES became the centerpiece of the Gas Service's Research Division, which used the facility to develop, manufacture, and test a variety of chemical weapons, including mustard gas and phosgene. This research was not confined to the laboratory, however, and included extensive field testing of artillery and mortar rounds containing various noxious agents. For example, 75 millimeter shells filled with different forms of mustard gas were fired in

2. For purposes of this Memorandum Opinion, the Court will use the term "claimants" to refer to those litigants who have asserted FTCA claims against the federal government. They are American University; Glenbrook Limited Partnership, Lawrence N. Brandt, Inc., Lawrence N. Brandt, and Robert Brant (collectively "Glenbrook–Brandt"); Thomas

and Kathi Loughlin; Patricia Gillum; and Camille Saum.

3. Established in October 1917 as part of the American Expeditionary Forces in France, the Gas Service eventually became part of the Chemical Warfare Service, which was created the next year (*see infra*, footnote 10).

order to determine the toxicity and range of the gas clouds produced. In an effort to simulate battlefield conditions, trenches were dug and bunkers built on the leased property, where gas weapons and incendiary devices were tested. For similar purposes, underground bomb and shell pits were constructed of concrete or wood at various locations around AUES, as well as on adjacent property owned by Charles Spaulding. *See* Martin K. Gordon, et al., *A Brief History of the American University Research Station* (Office of History Headquarters, U.S. Army Corps of Engineers, 1994) at 21–31 (*"Brief History"*).

Soon after World War I ended in November 1918, the Army ceased operations at AUES, and began to transfer personnel and equipment to other bases, in particular to the Edgewood Arsenal in Maryland. It is now undisputed, however, that some munitions and other materials associated with chemical weapons research remained buried in the University's property, either as a result of the ordnance testing or from being deliberately buried in pits located around the campus. In an agreement dated March 11, 1920, the Army pledged to restore the buildings and grounds to the condition they were in when the government took control of the facility. This arrangement, however, appears to have been superceded by a Memorandum of Agreement dated June 21, 1920, in which the University agreed to release the government from its obligation to restore the property in exchange for the transfer of title to certain buildings erected by the Army on the campus.[4]

The next set of relevant events occurred in 1986, when AU initiated plans to build a new athletic facility on its campus. At that time, the University discovered a 1921 article that had been published in *The American University Courier* indicating that the Army had buried munitions on or near the campus during World War I. The University conducted interviews and an extensive literature search in an effort to obtain information substantiating or refuting this report. It also sought help from the Army, which performed a document review and dispatched its ordnance disposal unit to scour the site using metal detectors. None of these investigations conclusively revealed the presence of any buried munitions,[5] and the athletic facility was completed as planned, although with the Corps on hand to supervise excavation and drilling. Claimants allege that around this same time, a study conducted by the Environmental Protection Agency (EPA) concluded that a parcel of property at 4825 Glenbrook Road, which adjoins the AU campus at its Glenbrook Road boundary, contained a probable burial ground for dangerous munitions and highly toxic materials. The government disputes this allegation.

---

4. It seems, however, that some salvage and restoration work did occur before the Army left AUES. Temporary structures built by the military but unwanted by the University were torn down or, if too heavily contaminated with toxic gases, burned. More permanent structures—including the concrete shell pits located on the Spaulding Property—were boarded up and surrounded with fencing in order to prevent access. *See Brief History* at 37.

5. Specifically, the Corps' investigation concluded that while the burial of materials could not be disproven, there "is no official evidence of any such burial at AU. Official correspondence from the period strongly suggests that all munitions were removed to Edgewood Arsenal .... If any materials were buried, they would probably have been small quantities of laboratory or experimental materials. All sources we found were inconsistent with the notion of substantial quantities of any munitions or the components for munitions existing at AU." *Loughlin,* 230 F.Supp.2d at 30 (citing AU Def.'s Resp., Ex. 10.)

In 1990, AU sold the Glenbrook Road property to Glenbrook–Brandt, which intended to begin construction of two houses there (4825 Glenbrook and 4835 Glenbrook). This construction was halted twice in May 1992 after Glenbrook–Brandt's workers were overcome by strong odors and suffered eye and lung pains requiring emergency hospital care. During excavation, workers also uncovered old laboratory equipment, possible chemical contaminants, broken jars, and a 55–gallon drum. Glenbrook–Brandt notified AU of these developments and requested that AU investigate. AU retained Environmental Management Systems (EMS), an industrial hygiene consulting firm, to look into these incidents. While the first set of tests came up negative, a second round identified the presence of the herbicide Silvex in the soil. EMS's report explained that Silvex is irritating to the eyes and senses, but is not a hazardous substance. Later that summer Glenbrook–Brandt removed four loads of the Silvex-contaminated soil from the property and proceeded with construction.

Meanwhile, in January 1993, workers excavating a separate piece of land approximately one mile from the Glenbrook Road property discovered an underground munitions bunker. The developer of that project called in the Army to investigate. Over the course of investigations that ran until 1995, the Corps unearthed a variety of live and spent munitions, ordnance-related debris, and laboratory materials, all dating from the World War I era.[6] The Army's investigation was part of Operation Safe Removal Formerly Used Defense Site (OSR FUDS), which was launched in the Spring Valley area in order to locate caches of buried weapons associated with AUES. This project was conducted under the authority of the Defense Environmental Restoration Program (DERP), 10 U.S.C. §§ 2701–2707, and Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*

As part of these efforts, in January 1994, the Corps asked and received permission from Glenbrook–Brandt to access the Glenbrook Road properties in order to sample the soil. The Corps' letter suggested that the soil there was not known to be hazardous and that sampling was being done solely for purposes of investigation and reassurance. The samples were collected on March 9, 1994. Additional soil and groundwater samples from a number of "points of interest" throughout the area were also gathered. In June 1995, the Defense Department issued its final Record of Decision, which concluded that no further action was necessary with respect to Operation Safe Removal in Spring Valley. This decision concluded OSR FUDS. During these operations, the Army removed 141 pieces of ordnance from the area, 43 of which were suspected of being chemical weapons. *See General Accounting Office, Report to the Subcommittee on the District of Columbia Committee on Government Reform, House of Representatives* (June 2002) at 3. (Claimants' Supp. Mem., Ex. 22 ("GAO Report").)

Meanwhile, in February 1994, plaintiffs Thomas and Kathi Loughlin tendered a purchase offer to buy the property at 4825 Glenbrook. After executing the sales contract, Glenbrook–Brandt informed the Loughlins of what had been discovered on

---

**6.** These events gave rise to a separate lawsuit against the government by the owner/developer of the property. *See W.C. & A.N. Miller Cos. v. United States,* 963 F.Supp. 1231 (D.D.C.1997) (denying defendant's motion for summary judgment and finding that the government owed a duty to warn plaintiff, as a subsequent purchaser of property, that it had buried munitions on the property).

the property during construction. As a result of these disclosures, the Loughlins hired an independent testing organization, Engineering Consulting Services (ECS), to sample the soil and conduct an evaluation of potential environmental hazards on the 4825 property. ECS conducted its independent investigation of the 4825 Glenbrook property on March 11, 1994. The firm analyzed four soil samples for eight metals, including arsenic, and numerous pesticides, herbicides, and volatile and semi-volatile substances. Its report concluded that no hazardous compounds were found and that the lot at 4825 Glenbrook Road had not been impacted by contamination from hazardous materials.

On March 21, 1994, the Loughlins contracted to purchase 4825 Glenbrook. Prior to closing, the Loughlins and Glenbrook–Brandt entered into an agreement whereby Glenbrook–Brandt indemnified the Loughlins in the event that hazardous materials were found. This Indemnification Agreement described the discoveries to date and the testing that had already been done on the property. Plaintiffs have explained that they expected that the government would conduct further soil sampling, but that the results would not be known prior to settlement.

Around this same time, the EPA conducted its own soil sampling at the 4825 property. EPA collected seven samples on March 11, 1994, one of which showed elevated levels of arsenic. Both the Loughlins and Glenbrook–Brandt have denied knowledge of this result, at least until it was disclosed to them by the Corps in early February 1999. Indeed, in January 1995, the Corps issued a letter to the

Loughlins and their neighbors indicating that the analysis of soil samples taken from their neighborhood had *not* detected the presence of chemical agents or explosives and that no hazard to human health or to the environment existed as a result of the Army's activities in Spring Valley.

However, in June 1996, workers planting a tree on the grounds of the AU President's house at 4835 Glenbrook, next door to the Loughlins' residence, were overcome by odors and fumes that burned their eyes. The workers unearthed laboratory glassware and broken bottles filled with chemicals. To investigate this incident, AU called in Apex Environmental, Inc, which conducted soil samples that confirmed the existence of a contaminated area approximately 12 feet in diameter and up to two feet deep. The most worrisome development was the presence of arsenic in the soil.[7] An investigation by the District of Columbia triggered by these events also revealed elevated concentrations of arsenic and other toxic substances, including hydrochloric acid.

Next, in February 1998, the Corps conducted a geophysical survey of the Korean Ambassador's residence at 4801 Glenbrook Road, which also abuts the 4825 property, and found two potential disposal pits that required further investigation. A similar geophysical survey was not done at 4825 Glenbrook. However, in April and June 1998, the Army sent letters to Spring Valley residents informing them that the Corps, in coordination with the EPA and the District of Columbia government, would be looking into whether additional materials or contaminants associated with chemical warfare existed at the 4801 Glenbrook site. After that investigation began

---

7. The Loughlins claim that while AU did inform them that a firm had been retained to investigate and clean up the soil at 4835 Glenbrook Road, they were not informed of the results of the Apex study, or that the chemicals unearthed on the property were hazardous or related to World War I chemical warfare material development activities. *See Loughlin,* 230 F.Supp.2d at 33 n. 9.

in February 1999, a 75 mm projectile was discovered buried only six inches deep in the backyard of the Ambassador's residence.

In December 1998, the Corps again contacted the Loughlins to express an interest in doing further investigation of their property "to confirm the absence of buried munitions, remnants thereof, and associated material." (United States' Stat. of Material Facts Not in Dispute ¶ 70.) Later that month, Corps representatives met with the Loughlins at their home to obtain permission to conduct further testing and to answer their questions. The Loughlins were temporarily relocated (from March to November 1999) to allow the Corps to conduct further soil sampling at 4825 Glenbrook, which it did on June 9, 1999. A total of 22 soil samples were gathered. All but four of the samples contained arsenic above the EPA Region III Risk–Based Concentration value of 0.43 mg/kg, the highest reading being 50.4 mg/kg. The Corps' final evaluation and analysis for the properties at 4801 and 4825 Glenbrook Road, which were based on the June 1999 samples, concluded that there was an "unacceptable hazard" from arsenic on the property. As a result, the Loughlins were again forced to leave their home, this time permanently.

Even before they left, the Loughlins had invoked the terms of their Indemnification Agreement with Glenbrook–Brandt. In a February 10, 1999 letter that referenced the apparent presence of chemical weapons and the corresponding government investigations, the Loughlins provided notice that they were considering invoking the buy-back provision of that agreement. This they did formally on March 27, 2000, requesting that Glenbrook–Brandt repurchase the property from them based on the now-confirmed presence of high levels of arsenic in the soil, as well as the discovery of more than 23 ordnance-related items from the disposal pit on the Korean Ambassador's property. Indeed, since 1996, further investigation by the Army has uncovered 667 pieces of ordnance in Spring Valley, 25 of which are chemical munitions, as well as 101 bottles of chemicals. *See* GAO Report, at 3.

As noted, these events have spawned a series of lawsuits, including claims brought against AU and the federal government by the Loughlins (Civil Action No. 02–152), by their nanny Patricia Gillum (*Gillum v. The American University,* Civil Action No. 02–294), and by another property owner from nearby Sedgwick Road (*Saum v. The American University, et al.,* Civil Action No. 02–349). The Court has previously denied AU's motions to dismiss the plaintiffs' claims in these cases, *see Loughlin v. United States,* 209 F.Supp.2d 165 (D.D.C. 2002), and has also denied the government's motions to dismiss except insofar as they were based upon the discretionary function exception, *Loughlin,* 230 F.Supp.2d at 29 & n. 3.[8] On December 19, 2002, the Court granted claimants' request for discovery regarding the existence of mandatory directives relevant to the discretionary function question, and requested further briefing on the application of that exception to the facts of these cases. That discovery having been completed and the parties' supplemental motions having been filed, the Court can now turn to the merits of defendant's argument.

## ANALYSIS

### I. Introduction to the Discretionary Function Exception

The question before the Court is whether the various negligence claims that have

8. The Court also reserved decision on the government's argument that AU's claims are barred by the statute of limitations. Given its conclusion herein, the Court need not reach that issue.

been brought against the federal government are barred by the discretionary function exception. While the FTCA generally authorizes a broad waiver of the government's sovereign immunity for claims sounding in tort, the statute exempts from this waiver "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). It is entirely irrelevant to this issue whether the government was negligent, or otherwise failed to protect the public from harm. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1540 (10th Cir.1992) ("Harsh as it may be, whether the Army substantially endangered Plaintiffs' health and welfare is irrelevant to the discretionary function determination."); *Allen v. United States*, 816 F.2d 1417, 1421–22 (10th Cir.1987). Rather, the only issue is whether in making the decisions that resulted in these lawsuits, the government was performing a discretionary function, and that determination does not hinge upon whether those decisions were wise and commendable, or, as the residents of Spring Valley now understandably contend, unwise and deplorable.[9] Instead, deciding whether § 2680(a) applies involves a two-step legal analysis, which must be applied separately for each action or omission upon which the claims against the government are based. *See Hughes v. United States*, 116 F.Supp.2d 1145, 1150 (N.D.Cal.2000).

First, the Court must consider whether the challenged action is actually a "matter of choice for the acting employee." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). To this end, Prong One of the inquiry asks whether a federal statute, regulation, or policy "specifically prescribes a course of action" for the federal employee or agency to follow, *id.*; if so, the actor has no lawful choice but to follow the directive, and as such, no discretionary judgment is implicated by his ultimate obedience or disobedience. *See United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) ("If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."). Not all regulations satisfy this standard; indeed, in order to preclude the government from availing itself of the discretionary function exception, a directive must "be mandatory and it must clearly and specifically define what the employees are supposed to do." *C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 799 (8th Cir.1993). A general directive that leaves implementation decisions in the hands of federal officials is not sufficient; instead, only those "regulations that give no options to a government agency take away the exercise of discretion." *Gotha v. United States*, 115 F.3d 176, 181 (3d Cir.1997); *see also Kelly v. United States* 241 F.3d 755, 761 (9th Cir.2001) (broad mandates that do not specify a particular course of conduct do not remove discretion); *C.R.S.*, 11 F.3d at 800–01 (no

---

9. Indeed, because the government's invocation of the discretionary function exception is a challenge to the Court's subject matter jurisdiction pursuant to FED. R. CIV. P 12(b)(1), claimants were not entitled to conduct discovery on the merits of their claim. *See Macharia v. United States*, 334 F.3d 61, 68 (D.C.Cir. 2003) (holding that merits discovery is "entirely irrelevant to the jurisdictional issue raised by the government's motion" to dismiss based on the discretionary function exception). As noted above, the Court did, however, allow claimants to take jurisdictional discovery as to whether the government was under any mandatory obligations to avoid making the allegedly tortious decisions that it made. *See also Ignatiev v. United States*, 238 F.3d 464, 467 (D.C.Cir.2001).

liability where those charged with implementing a mandatory requirement were given wide latitude regarding its execution).

■ Next, assuming the absence of a mandatory directive, and therefore the presence of some degree of judgment, the second prong requires the Court to determine whether the choice made is of the sort that the discretionary function exception was designed to shield. The Supreme Court has observed that in enacting the exception, "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). As such, the exception does not protect all governmental actions and decisions that include an element of choice. Instead, it shields *only* those that are "susceptible to policy analysis," in other words, those "based on considerations of public policy" or "grounded in regulatory policy." *Gaubert*, 499 U.S. at 323–25 & n. 7, 111 S.Ct. 1267; *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954; *see also Cope v. Scott*, 45 F.3d 445, 449 (D.C.Cir.1995) ("The mere association of a decision with regulatory concerns is not enough.").

■ Significantly, however, the Prong Two inquiry is not a subjective one. What matters is not what the decisionmaker was actually thinking (that is, whether matters of policy were actually considered), but rather whether the "nature" of the decision is one that implicates a policy judgment. *See Macharia*, 334 F.3d at 67; *cf. Shansky v. United States*, 164 F.3d 688, 692 (1st Cir.1999) ("The critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven

analysis."). It is therefore not necessary for the government to offer documentary or testimonial evidence that in making the challenged decisions, its employees specifically considered the kinds of policy issues that it now claims shield those decisions from liability under the FTCA.

## II. Prong One: Mandatory Directives

■ Over the past six months the claimants have conducted extensive discovery concerning the existence of mandatory directives relevant to the application of Prong One. The Court must now consider whether the materials they have obtained in fact reveal that the government violated any specific legal directives with respect to the claims at issue here. As described above, these events fall into three general categories: (1) the allegedly negligent handling and disposal of munitions during the World War I era; (2) the alleged failure to give adequate warnings to the public that chemical weapons were buried in the area; and (3) the allegedly negligent investigation and clean-up of the burial sites once the presence of munitions and munitions-related materials were suspected. For purposes of the present inquiry, the Court will divide its analysis between those actions and omissions that took place during the World War I era and those that took place after 1986, when claimants first began to suspect that toxic munitions were buried beneath their land.

### A. *Actions and Omissions During the World War I Era*

The claimants first argue that military personnel at AUES violated specific Army directives both by burying a large cache of chemical munitions and by failing to post adequate warnings about the burials that had occurred. In support of these assertions, claimants point to a set of manuals and bulletins issued by the Chemical War-

fare Service (CWS), the Army unit that ultimately became responsible for chemical warfare during the World War I.[10] Most significant is the *Gas Warfare Bulletin* issued by the Director of CWS and dated October 1, 1918. (FTCA Claimant's Supp. Mem, Ex. 3 ("*Bulletin*").) The *Bulletin* is described on its cover page as "A Summary of Information for Gas Officers" and includes a list of guidelines regarding the care, storage, and destruction of chemical warfare materials. Its prefatory information says that "[e]very officer charged with the Care, Storage or Handling of Gas Warfare Material should have a copy of these instructions." *Bulletin* at 31.[11]

Among the *Bulletin*'s "General Rules for Storage" are the following warnings about the proper storage of chemical ammunition: "Do not permit uncased ammunition to lie around. Keep it out of the mud or dirt, inspect carefully and frequently and keep it clean.... Cases of fixed ammunition must not be left on the ground level, and to guard against dampness, should be kept about 20 centimeters above the ground." *Bulletin*, at 34. At the same time, the *Bulletin* specifically permits (and indeed recommends) the burial of leaking or otherwise defective chemical munitions: "The suspected shell should be located immediately and removed and buried.... Holes 4 feet deep will always be kept prepared and a supply of lime kept on hand in a dry place to take care of this condition." *Id.* When this procedure is used, however, the location of the burial must be indicated: "Spots where defective shells are buried should be marked by sign-posts driven into the ground, and marked in some appropriate manner."[12] *Id.*

10. The CWS was created in June 1918 and was charged with "the work of research, development, proving, and manufacture of poison gases, gas defense appliances, and the filling of gas shell; also with organizing and training all gas troops, the training of the entire Army in methods of gas defense and cooperation with the Artillery in the tactical use of chemical shell." Annual Report Director of Chemical Warfare Service, For Fiscal Year Ending June 30, 1919, at 4377 (Claimants' Reply, Ex. 44, at 000147.)

11. A second document, the *Manual of Gas Warfare,* describes how artillery troops should handle and store chemical weapons, and contains similar warnings. Several difficulties, however, beset claimants' efforts to rely on this document as a mandatory directive. First, the cover page of the *Manual* describes it as a "proposed publication not yet approved by the Commander–in–Chief, American Expeditionary Forces." (Claimants' Supp. Mem., Ex. 4, at 00190.) As such, it lacks the force of law, and cannot remove the element of choice from those actually covered by the rules. Moreover, there is little reason to believe that the *Manual* was intended to regulate the experimental activities that took place at AUES. The document was a publication of the American Expeditionary Forces (AEF), the wing of the U.S. military responsible for waging World War I in Europe. The section of the *Manual* on which claimants rely is entitled, "Use of Gas by Artillery" and focuses on just that: how *field artillery units* are to use, transport, store, and dispose of the new gas munitions that were being deployed. By its terms, therefore, these guidelines were intended for combat troops in battlefield conditions, and are not directed at the activities and purposes of an experimental research and development facility located on the home front. For these reasons, the Court finds that the *Manual* does not set forth mandatory directives under Prong One concerning the handling of chemical weapons at AUES. *Cf. Miller,* 963 F.Supp. at 1239 (concluding that similar AEF regulations did not apply to AUES, but instead were "related to combat forces and battlefield activity").

12. The *Bulletin* authorizes another method for disposing of defective chemical munitions: blowing them up. However, it goes on to note that it "is much easier to bury leaky shells as explained in preceding paragraph, *but the blind spot must be marked and is a source of danger for some time after.* When facilities are at hand for blasting leaky shells they should be destroyed in this manner, the next best thing, however, is to bury and cover with lime and mark the spot." (*Bulletin,* at

Based on these statements, claimants contend that the officers at AUES were expressly forbidden from burying non-defective chemical munitions and obliged, whenever defective shells were buried, to use certain precautionary procedures, including conspicuously marking the burial spot and warning of the danger that lay beneath the soil. (Claimants' Supp. Mem. at 26–27.) There are at least two problems with this argument. The first concerns the nature of the document at issue. "An agency manual, in contrast to a regulation, is not necessarily entitled to the force and effect of law. This is particularly true if the agency did not intend the manual to be mandatory, but rather intended it as a guidance or advisory document." *Aragon v. United States,* 146 F.3d 819, 824 (10th Cir.1998) (internal citations omitted); *see also Bowman v. United States,* 848 F.Supp. 979, 983–84 (M.D.Fla. 1994) (holding that a Navy manual was not a mandatory regulation where its purpose was to serve merely as a "guide" for conducting waste disposal).

While the circumstances surrounding the promulgation and intended effect of the *Bulletin* are not entirely clear from the record (and may simply be lost to history), it is noteworthy that the *Annual Report Director of Chemical Warfare Service, For Fiscal Year Ending June 30, 1919* ("*Annual Report*") makes clear that the "Gas Warfare" pamphlets and bulletins issued by the Training Division of CWS were not intended to be binding directives, but in-

stead were used as a means to gather and share information among different components of CWS. (Claimants' Supp. Mem., Ex. 44 at 000174.) While it has not been conclusively established that the *Gas Warfare Bulletin* is actually one of the specific bulletins to which the *Annual Report* refers, there is no reason to believe that the Army intended it to have a different effect. Indeed, the cover page describes the document as a "summary of information," which suggests that its primary purpose was to provide guidance, not a rule of law.[13] In the absence of any indication that CWS considered the rules set out in the *Bulletin* to remove all discretion from officers charged with handling and storing chemical weapons, the Court is unwilling to conclude that this document constitutes a mandatory directive under Prong One.

Second, even if the *Bulletin* did have the force of law, it appears not to have applied to the activities taking place at AUES. The document is addressed to "gas officers," a title which is not defined in the *Bulletin* itself. Fortunately, however, there are some contemporaneous sources that shed light on its meaning. These sources suggest that the term referred to officers specially trained in chemical warfare and assigned to units in battle or training for battle. Thus, the *Annual Report* describes the gas officer as an integral part of a *combat* unit, noting that "[a] gas officer and assistants were placed on the staff of each division, corps, and army commander. It soon became apparent that an

---

36 (emphasis added).) Similar instructions are provided in the *Manual,* which also offers both burial and explosion as permissible ways to handle leaking shells. When burial is used, "[s]hell should be buried six feet deep and covered with a layer of chloride of lime before filling in the earth.... Spots where defective shell are buried should be indicated by sign posts driven into the ground and marked in an appropriate manner." (*Manual,* at 38.)

**13.** Moreover, the *Bulletin* includes reprints of AEF's "Weekly Summary of Information" for the weeks of August 14, 21, and 28. While these sections of the *Bulletin* have not been provided to the Court, the fact that they were made part of the original document strengthens the government's argument that the *Bulletin* was issued for informational rather than regulatory purposes.

efficient gas officer must become a versatile man.... An efficient gas officer became a walking encyclopedia on the characteristics of German battle gases." (Claimants' Supp. Mem., Ex. 44 at 000152.)

The inference that "gas officers" were associated with combat operations—rather than experimental research of the sort taking place at AUES—is further reinforced by General Order No. 79, issued by the AEF in May 1918. This Order directs that "[a] gas officer will be appointed by the unit commander for every regiment, for every battalion and/or separate units; a gas non-commissioned officer will be assigned as assistant to each of these gas officers and two gas non-commissioned officers will be appointed for each company." Gen. Order No. 79, ¶ 5. (U.S.Surreply, Supp.Ex. 18.) Moreover, the duties of these officers related directly to combat and combat training:

> Regimental and battalion gas officers will, under the direction of their commanding officers, supervise the training of the troops of their organization in the use of respirators, gas-proof shelters, alarm systems and other measures of protection against gas provided for in the manual on defense against gas, or authorized by G.H.Q. When a division is in the line, inspection of all gas defense equipment and of measures for protection against gas will be made by these officers at least twice a week.... These officers and the gas non-commissioned officers under their direction will assist division gas officers in obtaining information regarding new methods of gas warfare employed by the enemy and regarded [sic] material of enemy origin.

Id. ¶ 6. Indeed, the only reference in this Order to research or experimentation suggests that gas officers were not directly involved in such activities: chief gas officers were directed to "collect and transmit to the proper laboratories or proving grounds all materials of enemy origin which may give information regarding new methods of gas warfare employed by the enemy." Id. ¶ 3.

These sources strongly suggest that "gas officers," as that position was defined during the World War I era, were not stationed at AUES and were not involved in the chemical weapons research that took place there. Indeed, the Brief History reports that the bulk of the AUES staff consisted of scientists and engineers, some of whom had been given commissions in the Gas Service when the facility was transferred from the control of the Bureau of Mines to the Army. See Brief History at 20. No mention is made of "gas officers." And the Bulletin, for its part, never refers to AUES or any other research facility. In contrast, the above-quoted portion of the "General Rules" comes from a section entitled "Gas Operations and Defensive Measures," which only reinforces the Court's conviction that the directives contained therein (if they can even be understood as directives) were not meant to apply to a facility like AUES, but rather were intended as instructions to officers charged with handling and using chemical munitions in the field of battle. Therefore, the Court finds no basis to infer that the Bulletin was intended to impose mandatory obligations on those stationed at AUES to take particular precautions in storing or disposing of the chemical munitions that were the subject of their experiments.

Next, claimants contend that the kind of large-scale burial that apparently occurred at AUES was expressly forbidden by CWS rules. Their only basis for this claim, however, is the statement in the Manual that where "there are large numbers of leaking shell, it is more satisfactory to explode them rather than to bury them, thus preventing the contamination of the

area from a large number of buried shell." *Manual,* at 38. Even were the Court to assume that the *Manual* was binding at AUES, this observation hardly amounts to a directive. Instead, it merely suggests the advantages of one particular solution to a problem, leaving the ultimate decision (and thus the ultimate discretion) about whether to bury or burn leaking munitions in the hands of the individual artillery unit. Try as claimants might, they simply cannot convert CWS's commonsense observation into a binding order not to bury large caches of munitions.[14]

Nor is there support for the suggestion that burial on private property violated specific rules or regulations. It is true that orders dated September 1917 governing conduct at Camp American University state that "[m]embers of the command [the 20th Engineers] are instructed to exercise special care to do no damage to buildings or grounds, and are cautioned not to trespass upon or damage this or any other property." (Claimants' Supp. Mem., Ex. 26.) Nothing in these orders, however, so much as hints that they were meant to govern the activities at AUES, which was a facility separate and distinct from the Corps-operated Camp American University. Indeed, at the time these orders were issued, AUES was not even under military control, but rather was controlled by the Bureau of Mines. And, in light of the stated mission of AUES after it came under the authority of CWS—which regularly included live fire field testing of a wide variety of chemical weapons and incendiary devices—it strains credulity to suggest that the rather genteel orders promulgated by the Corps for its training school applied to the far more intense operations of the research facility.

Claimants also argue that the Army violated a direct order to ship chemical weapons from AUES to Edgewood Arsenal at

---

14. Claimants also point to more general Army regulations concerning surplus ordnance, arguing that these rules forbade the abandonment of serviceable munitions, and as such, prohibited the burial of chemical weapons that occurred at AUES, at least insofar as the munitions interred were not defective. *See* Regulations for the Army of the United States 1913 (Corrected to April 15, 1917) § 1532. (Claimants' Supp. Mem., Ex. 18.) The text of these regulations, however, simply does not support this argument. The provision on which claimants rely reads as follows: "Serviceable surplus ordnance stores in the hands of post or other ordnance supply officers, not required for reserve, may be shipped to another post in the same department, or may be turned in to the nearest arsenal on the order of a department commander or, in the hands of a recruiting officer, on the order of the War Department." The language used here is permissive; it merely purports to tell officers what they *may* do with surplus weapons. By its terms, it does not forbid any particular disposal practice, and is entirely silent as to burial. Accordingly, the regulation hardly provides the kind of specific and mandatory directive required to eliminate governmental discretion under Prong One. *See Miller,* 963 F.Supp. at 1239 (reaching the same conclusion about the 1913 regulations); *cf. McDougal v. U.S. Forest Serv.,* 195 F.Supp.2d 1229, 1236–37 (D.Ore.2002) (holding that similar language in a Forest Service manual did not give rise to a mandatory duty to act); *cf. Kelly v. United States,* 241 F.3d 755, 761 (9th Cir.2001) (holding that a general regulation or policy does not remove discretion unless it "specifically prescribes a course of conduct").

As for the 1881 Army regulations detailing the procedures to be followed before military property may be destroyed, claimants have not pointed to anything suggesting that these rules covered the kind of activity that occurred at AUES. *See* Regulations of the Army of the United States and General Orders in Force on the 17th of February, 1881, §§ 2554–2556. (Claimants' Supp. Mem., Ex. 29.) They appear to be general rules governing the disposal of conventional ordnance. Without more, this Court cannot conclude that they were intended to govern the disposal of a weapon, which was not even in existence when the regulations were drafted, by an experimental facility engaged in cutting-edge research and development during a time of war.

the close of the war. In correspondence dated February 10 and March 1, 1919, AUES's Ordnance Officer requested permission from CWS to ship a certain quantity of bombs, shells, and other munitions from AUES. In the ensuing order, the Office Director of CWS responded: "You are directed to ship the bombs, incendiary and smoke, and shell Mark II and II to Commanding Officer, Edgewood Arsenal, Edgewood, Maryland for storage." (Claimants' Supp. Mem., Ex. 31.) While this may look like a directive, it is not reasonable to infer that it relates to the claims put forth in these cases.

On its face, this order refers only to particular quantities of specified munitions; there is no indication that it was meant to cover AUES's entire remaining inventory, and it certainly imposes no express duty to dig up weapons that may already have been buried. Indeed, the order in no way purports to forbid the two World War I-era activities on which claimants' claims are based: the burial of chemical weapons and the failure to provide adequate warnings that such burials had been carried out. Rather, the fair inference from the document (along with the correspondence that preceded it) is that it was meant to give AUES formal bureaucratic approval to ship a load of weapons for which, in the war's aftermath, it no longer had any use. In contrast, there is no reasonable basis for reading the order as requiring AUES to transfer its entire stock of munitions to Edgewood Arsenal and to leave nothing behind. And it would be sheer speculation to conclude that the shells ultimately discovered in the ground were put there in violation of this shipping order. Because claimants have drawn no connection between the specific objects referenced in the shipping order and the buried weapons that have allegedly damaged their property, the Court is unwilling to treat this document as a mandatory directive that took away the discretion of those officers stationed at AUES to do as they did with the munitions that have generated these lawsuits.

Finally, claimants also rely on a letter written in July 1919 by the Commanding Officer of Edgewood Arsenal to the Director of CWS, which suggests that the arsenal's excess stock of mustard gas should be dumped into the ocean. (Claimants' Supp. Mem., Ex. 23.) Such reliance is misplaced, however, as this document is clearly neither an order nor a directive, but instead appears to be merely a recommendation about which method of disposal best balances practicability, safety, and other concerns. There is certainly no indication that the recommendation had any binding force, or that it left CWS with no lawful choice but to obey. Moreover, even if the document did impose some obligation, there no indication that such obligation extended to the chemical weapons at AUES. Indeed, the letter discusses *only* munitions stored at Edgewood; it says nothing whatsoever about AUES or the mustard gas shells located there. There is thus no reason to believe that the officers stationed at AUES were under any duty to heed Edgewood's dictate.

For these reasons, the Court concludes that claimants have not demonstrated the existence of any mandatory directives issued during the World War I era that would have either forbidden AUES officials from burying chemical weapons in Spring Valley or required those officials to post warnings that they had done so. Having so ruled, the Court turns now to the events of the more recent past to determine whether claimants' search for binding regulations has been more fruitful.

B. *Actions and Omissions From 1986 until the Present*

The next issue is whether and to what extent government officials were bound by

mandatory directives when they conducted their investigative and clean-up operations in Spring Valley, beginning with the Army's 1986 inquiry, which concluded that no danger existed from any munitions left over from the World War I era. While the government concedes that "numerous statutes and regulations ... governed the investigation and remediation activities at Spring Valley," it asserts that these laws are simply irrelevant to the claims that have been made against it in these cases. (U.S. Resp. at 19.) Claimants counter that these directives speak directly to their claims that the government both negligently performed its remedial undertakings and failed to warn area residents about the hazards that were discovered.

For the most part, claimants are quite general in their description of the statutes and regulations that they believe have been violated. Indeed, they point to only three specific directives, none of which supports their argument. The first is a Department of Defense Safety Standard issued in August 1997 concerning the cleanup of Formerly Used Defense Sites (FUDS) contaminated with ammunition, explosives, or chemical weapons. (Claimants' Supp. Mem., Ex. 39.) This standard requires the relevant Defense Department component to develop remedial procedures and then to submit those procedures to the Department of Defense Explosives Safety Board (DDESB) for review, approval, and coordination. (*Id.* at C.3.) Claimants contend that the Corps did not submit its remediation plans for the Glenbrook Road property as required. Moreover, they suggest that the Standard also obliged the Corps to examine the ground beneath this property to a depth of at least 10 feet as part of its remedial excavation. (*Id.* at C.4.e.)

Even assuming that the submission requirement is a mandatory directive and that its breach is somehow relevant to the underlying FTCA claims (claimants have not explained how this is so), the record is undisputed that the Corps did in fact comply by supplying its plan for 4825 Glenbrook Road to DDESB. *See* Memorandum for Commander, U.S. Army Corps of Engineers (May 8, 2001), ¶ 2. (U.S.Supp. Ex. 6.) As for the alleged 10–foot requirement, a review of the relevant section of the Standard makes clear that this depth is merely a guideline and is in no way a binding rule. Indeed, the Standard says explicitly both that the "preferred method to determine the remediation depth is to use site-specific information" and that the "approved remediation plan may be modified based on actual conditions encountered during the remediation." The 10–foot standard comes into play only where site specific planning is not possible, and even then the suggested depth is used only for "interim planning." (Claimants' Supp. Mem., Ex. 39, at 3.c-d.) These caveats undoubtedly remove this numerical benchmark from the realm of mandatory directives, as it is obvious that the Standard gives the officials in charge of cleanup ample discretion to determine the appropriate remediation depth based on the specific features of the site in question. Ten feet is merely a guideline and is not binding; thus, even if the Corps failed to use that figure in its work at the Glenbrook Road property, that would not suffice to preclude its reliance on the discretionary function exception.

Next, claimants contend that the Army violated federal law by not including Spring Valley on the inventory published by the EPA of sites at which hazardous waste is stored or disposed. The Resource Conservation and Recovery Act (RCRA) requires each federal agency to "undertake a continuing program to compile, publish, and submit to the Administration [of the EPA] ... an inventory of each site which

the Federal agency owns or operates or has owned or has operated at which hazardous waste is stored, treated, or disposed of or has been disposed of at any time." 42 U.S.C. § 6937. In turn, the EPA is required to publish this information in its Federal Agency Hazardous Waste Compliance Docket. 42 U.S.C. § 9620(c). Pointing out that Spring Valley has never been listed on this Docket, claimants contend that the Army must have neglected to mention the site contrary to the mandate of § 6937. This is simply not so. In compiling the Hazardous Waste Docket, the EPA has been very clear that it will not list sites that were once owned by a federal agency but have now passed into private hands. See 68 Fed.Reg. 107–01, 109 (Jan. 2, 2003) ("Facilities formerly owned by a Federal agency and now privately owned will not be listed on the docket."); 53 Fed.Reg. 4280, 4281 (Feb. 12, 1988) ("EPA has decided not to include in the docket at this time . . . [f]acilities formerly owned by a Federal agency and now privately owned."). Thus, under long-established EPA policy, sites such as Spring Valley were excluded from the Docket. The failure to publish cannot therefore be traced to the Army's violation of a mandatory directive.

Finally, claimants contend that the Army did not comply with provisions of the FUDS program, presumably during Operation Safe Removal. While these allegations lack specificity, claimants do suggest that the Corps failed to establish a Restoration Advisory Board (RAB) to facilitate public education about the cleanup effort. (Claimants' Supp. Mem. at 36–37.) The creation of a RAB satisfies the review committee requirement of 10 U.S.C. § 2705(c): "Whenever possible and practical, the Secretary shall establish a technical review committee [TRC] to review and comment on Department of Defense actions and proposed actions with respect to

releases or threatened releases of hazardous substances at installations." See 10 U.S.C. § 2705(d) (allowing a RAB to take the place of a TRC "where the Secretary is planning or implementing environmental restoration activities"). In turn, the Department of Defense's DERP Management Guidance provides that each FUDS shall establish a RAP "where there is sufficient and sustained community interest." Management Guidance for the Defense Environmental Restoration Program (Sept. 2001), § 10.7. (Claimants' Supp. Mem., Ex. 40.)

The text of these provisions makes clear that, even if it is true (as claimants suggest) that a RAB was not created for Spring Valley until 2001, no mandatory directive was thereby violated. The statute leaves the establishment of a RAB firmly within the discretion of the Secretary of Defense. A RAB is not required under any and all circumstances; instead, one is properly formed where doing so is "possible and practical." Such language is fundamentally at odds with the sort of mandatory directive contemplated by Prong One. See Aragon, 146 F.3d at 824 (holding that a requirement that federal agencies take such action "as may be practicable" to insure the disposal of waste did not eliminate immunity; that phrase "is a prime example of discretionary language, which gave federal agencies a choice or judgment on what action to take, if any ") (emphasis added); Wells v. United States, 851 F.2d 1471, 1477 (D.C.Cir.1988) (suggesting that Prong One is inapposite where "the policies and programs formulated by the government allow room for implementing officials to make independent policy judgments"). Similarly, the language in the Management Guidance gives discretion to those in charge of the FUDS to monitor community interest and to establish a RAB only when that interest

is sufficient. As such, the question of when to create a RAB is ultimately one about which the relevant government officials retained a degree of choice. Because there was no fixed path to follow, the Corps' decision to wait is not automatically stripped of protection as a non-discretionary function.

Insofar as claimants argue that the government violated other, unspecified rules of the FUDS program, their allegations suffer from the same problems that beset their attempts to satisfy Prong One by pointing generally to the assortment of environmental laws that governed the Spring Valley investigation and cleanup efforts. All of these allegations are simply too amorphous and ill-defined to carry the day. In a catchall passage in their Supplemental Memorandum, claimants cite the government's own statements that a wide variety of statutes and regulations governed the Army's investigation and clean-up efforts in Spring Valley. Among this litany are CERCLA, DERP, the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 C.F.R. § 300.1 et seq., the Clean Air Act, the Clean Water Act, and the Toxic Substances Control Act. (Claimants' Supp. Mem. at 34–35.)

The fact that the government, as a general matter, may have been required to conduct its activities in accordance with these laws does not, however, suffice. To prevail under Prong One, claimants "cannot simply accuse the government of violating a law, regulation, or scientific standard in some general sense. The nature of the specific, mandatory constraint on its discretion must be clearly identified." *Gould Electronics Inc. v. United States,*

2002 WL 27834, at *9 n. 4 (E.D.Pa. Jan.10, 2002) (holding that the "general health and safety goals of CERCLA" are not "specific and mandatory directives").[15] Despite having been given the opportunity to conduct discovery on this issue, claimants have not identified a single specific provision of the statutes listed above that the government may have violated during its remedial activity in Spring Valley. Without such specifics, however, it is impossible to conclude that the government officials in charge of these operations truly lacked discretion in deciding what steps should be taken to uncover buried munitions, to warn members of the community of the dangers that those munitions might pose, and ultimately to alleviate those dangers.

■ This is so because even if some of these laws do include mandatory language, it is well-settled that the existence of such language "does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Miller v. United States,* 163 F.3d 591, 595 (9th Cir.1998); *e.g., Tippett v. United States,* 108 F.3d 1194, 1197 (10th Cir.1997) (holding that a directive that "the saving of human life will take precedence over all other management activities" was too general to divest a federal ranger of discretion). It is claimants' responsibility to come forward with evidence that the federal officials in charge of the Spring Valley project truly had no choices to make. Merely enumerating the relevant environmental protection laws does not discharge this responsibility. *Cf. Cisco v. United States,* 768 F.2d 788, 789 (7th Cir. 1985) (holding that nothing in RCRA, CERCLA, or the NCP requires the federal government "to warn property owners

15. Put another way, the burden of *production* as to Prong One rests with the claimants, as the "government is not required to generate a comprehensive list of all the laws, regulations, and standards that do not apply to its decision in order to establish that it acted with permissible discretion." *Gould,* 2002 WL 27834, at *9 n. 4.

that residential landfills have been contaminated by highly toxic wastes or to remove those wastes. Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes.").

There is a second problem with claimants' failure to identify the particular obligations imposed on the Army by these statutes. To cancel discretionary function immunity, a directive must not only be specific and mandatory, it must also be *relevant* to the claims underlying the suit. The point is obvious, but claimants seem to have ignored it. To illustrate, imagine that a federal agency charged with removing hazardous waste from a contaminated site failed to pay its employees overtime pay in clear violation of federal labor laws. If an FTCA claim was brought in which plaintiffs alleged that the agency was negligent in not cleaning up the site adequately, they could not use the agency's nonpayment of overtime to prove the inapplicability of the discretionary function exception. For, in such a case, the conduct about which the agency lacked discretion (whether to pay overtime) would be entirely unrelated to the substantive tort claim from which the agency seeks shelter in the exception. In other words, then, the federal government only loses its ability to rely on the discretionary function exception where the conduct that is the subject of the underlying tort claim is also the subject of the mandatory directive.

Here, because claimants have pointed only generally to broad statutory outlines, the Court has no way of knowing whether the more specific directives contained within those statutes (assuming that they exist) are even arguably related to the claims that have been asserted against the government. As described above, these claims fall into two categories: first, that the government failed to issue adequate warnings about the burial of weapons and the harms associated with buried weapons; second, that the investigation, removal and remediation of the area was performed negligently. As such, a mandatory directive would be relevant only if it somehow related to those claims, that is, if it either imposed a specific duty on the government to issue warnings or to take certain actions in the course of its investigation and cleanup that could have made those operations more successful. Nothing in claimants' parade of statutes so much as hints at any particularized obligations to warn. Such requirements, if they exist, should be identifiable. Claimants' failure to do so means that they have not satisfied their burden of production regarding their inadequate warning claims.[16] Similarly, claimants have not even attempted to explain how anything in

16. Perhaps recognizing this inadequacy, claimants seek to rely on what they believe to be the Army's own admission that it violated established directives in not going public with the information it was uncovering in its investigation of munitions burials in Spring Valley. This argument is specious. It is true that in 1995, the Army investigated the question of whether local authorities and third parties were notified in 1986, when Spring Valley was identified as a chemical weapons waste site, in accordance with laws and regulations then in effect. And, in a chart used during a conference between the U.S. Army Audit Agency and the Corps in response to the claims ultimately resolved in the *Miller* litigation, the agency put forward its conclusion that the Army did not do so. (Claimants' Supp. Mem., Ex. 14.) However, the government now argues that this chart merely reflected a "working hypothesis," and points out that it was contradicted by the actual report issued on July 27, 1995. There, the auditors concluded that the Army "wasn't required to notify local authorities and third parties when it identified Spring Valley as a possible chemical weapons waste site in 1986." (Claimants' Supp. Mem., Ex. 15 at SVL06–00009.) As such, the Court cannot accept the premise of claimants' argument

these statutes might be relevant to their negligence claims.

In the end, it may well be that the federal government could have done a far better job in its investigation and cleanup of Spring Valley, or that it could have taken more effective steps to notify the public of the hazards that had been identified. Indeed, it may be that the government should not have buried the munitions there to begin with. But these possibilities are simply not relevant under the discretionary function exception. Instead, under Prong One, what matters is whether, first in burying the weapons and then in trying to remove them and to remedy the harm that they caused, the relevant officials failed to comply with specific provisions of law that purported to eliminate their discretion to act as they did. As explained above, claimants have not made this showing. The specific directives to which they have pointed are not sufficiently mandatory, and any arguably mandatory directives are not sufficiently specific. For these reasons, the Court concludes that, from the World War I era to the present, governmental discretion was indeed implicated by what has occurred in Spring Valley. Given this conclusion, the Court must now consider Prong Two of the analysis: whether that discretion is of the sort that the discretionary function exception is designed to protect.

## III. Prong Two: Policy Judgments

In assessing whether the governmental actions challenged in these cases implicate the kind of policy judgments that lie at the core of the discretionary function exception, the Court will first examine the events of the World War I era and then proceed to consider the remedial activity that occurred in the last two decades.

### A. Actions and Omissions During the World War I Era

As described above, there are two strains of tort claims that grow out of the activity that occurred during the World War I era. Claimants first challenge the military's actual handling of the chemical weapons and paraphernalia, contending that the burial of munitions and other potentially toxic materials at AUES was negligent. Second, they challenge not the decision to bury, but rather the failure to provide adequate warnings of those burials. As to the first, there can be little serious dispute that the Army's decisions—made during wartime and its immediate aftermath—regarding the most appropriate ways to handle and dispose of experimental munitions constitute discretionary decisions of the most fundamental kind. Even if the Army suspected that burying chemical munitions could cause environmental damage, as claimants allege, there were undoubtedly significant policy considerations that attended upon the decision about what to do with those weapons. As the Tenth Circuit has recognized, the "nature of the military's function requires that it be free to weigh environ-

---

that the government in fact formally admitted that it violated any laws or regulations by not disclosing what it knew about conditions in Spring Valley.

As to the audit's dictum that "only if the research had concluded that hazardous munitions actually existed in Spring Valley would the Army have been required to notify the public," (*id.* at SVL06–00010), the Court agrees with the government that this vague

reference is insufficient under Prong One. As discussed above, in order to demonstrate that government officials truly had no choice about a particular matter, it must be shown that a specific and binding directive set forth the path that had to be followed. Judged against this standard, it cannot be argued that the government had a legal duty to warn based merely on the unsupported remarks in the audit report.

mental policies against security and military concerns." *OSI, Inc. v. United States*, 285 F.3d 947, 953 (11th Cir.2002) (holding that the disposal of waste on a military base is protected by the discretionary function exception). This is particularly true at an advanced research facility whose mission was to learn about the capabilities of and the threats posed by this new form of weaponry, and to do so under the most extreme pressures of time and the most compelling demands of national defense.

It is for this reason that claimants focus primarily on their failure to warn claims. *Cf. Maalouf v. Swiss Confederation*, 208 F.Supp.2d 31, 37 (D.D.C.2002) ("Courts . . . have found that an underlying decision to create a dangerous condition was discretionary even where the decision not to warn the public of the danger was not discretionary.") Essentially, their argument here is that the government's failure to warn about a known health or safety risk that is within its control is not one grounded in public policy and thus unprotected by the discretionary function exception. (Claimants' Supp. Mem. at 6–7.)

As an initial matter, it is important to address a misconception that appears to underlie much of claimants' analysis. "Safety" is not some talisman that automatically renders a decision nondiscretionary. Safety and discretion are not mutually exclusive; just because a decision implicates safety concerns does not necessarily mean that it is unrelated to public policy. This point is well illustrated by the D.C. Circuit's recent decision in *Macharia v. United States*. There, the Court affirmed the dismissal on discretionary function grounds of a suit brought by a Kenyans injured during the bombing of the U.S. Embassy in Nairobi. Among the claims dismissed was one based on the government's alleged failure to issue adequate warnings to Embassy personnel about the threat of terrorism. The D.C. Circuit adopted the district court's analysis, which relied on the fact that "each of Defendant's decisions regarding security involved balancing potential inconvenience to State Department employees against the perceived security gains that would result from a safety measure." *Macharia*, 334 F.3d at 67 (quoting *Macharia v. United States*, 238 F.Supp.2d 13, 25 (D.D.C.2002)). Thus, although the challenged governmental decision involved a failure to warn that implicated matters of safety, the discretionary function nevertheless barred the suit.

*Macharia* stands for the proposition that the government is entitled, without fear of liability under the FTCA, to balance the safety benefits associated with issuing warnings about suspected or potential dangers against the security and other policy-related problems that might result from issuing such warnings. Accordingly, the proper focus of the Prong Two inquiry in a failure to warn case is not whether safety is at issue, but instead whether the alleged negligence in fact arose out of a decision grounded in policy considerations. If so, the governmental choice cannot be the subject of an FTCA claim, even if the decision-maker may have sacrificed or devalued public safety concerns in making that choice. *See Bowman v. United States*, 848 F.Supp. at 985 ("Any decision which balances competing considerations or identifiable policy factors, such as budgetary constraints, *safety concerns*, or allocation of limited resources, may be discretionary.") (emphasis added).[17] A contrary

---

**17.** In a different case with the same name, the Fourth Circuit held that the National Park Service's decision not to install a guardrail on a dangerous section of the Blue Ridge Parkway, which led to a fatal car accident, fell within the discretionary function exception.

rule of the sort that claimants suggest would render the discretionary function exception meaningless, as almost any government decision that results in personal injury (and thus a suit under the FTCA) can be said to involve issues of safety.

That said, the Court recognizes, as it did in *Maalouf,* that the government's failure to warn of specific known hazards on government owned or controlled property often involves fewer core policy judgments that do other kinds of decisions, and for that reason is frequently not protected by the discretionary function exception. *See Maalouf,* 208 F.Supp.2d at 37–38 (holding that Swiss Embassy's failure to warn about a guide wire on a tree that caused a sledding accident was not grounded in public policy); *see also, e.g., Cestonaro,* 211 F.3d at 755–59 (National Park Service's failure to warn about the dangers associated with parking in a poorly-lit lot in which previous crimes had been committed); *Duke v. Dep't of Agric.,* 131 F.3d 1407 (10th Cir.1997) (Forest Service's failure to post signs warning of the danger of boulders falling down a man-made slope in Gila National Forest); *Faber v. United States,* 56 F.3d 1122 (9th Cir.1995) (Forest Ser-

vice's failure to post warning about the dangers from diving from a rock ledge atop a waterfall); *Cope,* 45 F.3d at 450–51 (failure to post signs warning of hazardous road conditions in Rock Creek Park); *Summers v. United States,* 905 F.2d 1212, 1215–16 (9th Cir.1990) (National Park Service's failure to warn of dangers posed by walking on hot coals); *Boyd v. United States ex rel. U.S. Army Corps of Engineers,* 881 F.2d 895, 898 (10th Cir.1989) (failure to warn of hazards associated with swimming in a government-owned lake).

At the same time, however, there is no shortage of contrary authority holding that similar failure to warn claims may properly be precluded as challenges to discretionary functions. *See, e.g., Valdez v. United States,* 56 F.3d 1177, 1180 (9th Cir.1995) (National Park Service's failure to warn about dangers of hiking down the face of a waterfall);[18] *Kiehn v. United States,* 984 F.2d 1100, 1103–06 (10th Cir.1993) (National Park Service's failure to warn about the dangers of scaling sandstone cliffs was protected because the "decision not to post warning signs in remote areas of a national monument inherently requires a balancing of public policy objectives, such as re-

In so holding, the Court expressly rejected the exclusivity of safety and discretion: "Whether the decision grew out of a lack of financial resources, a desire to preserve the natural beauty of the vista, a judgment that the hazard was insufficient to warrant a guardrail, or a combination of all three is not known. What is obvious is that the decision was the result of a policy judgment. *One can argue that another policy, which places greater emphasis on safety, is more desirable.* However, by the discretionary function exception, Congress intended to prevent courts from second-guessing federal policy. It is precisely this type of decision which Congress intended to shield from liability because 'where there is room for policy judgment and decision, there is discretion.'" *Bowman v. United States,* 820 F.2d 1393, 1395 (4th Cir.1987) (quoting *Dalehite v. United States,* 346 U.S. 15, 36, 73

S.Ct. 956, 97 L.Ed. 1427 (1953) (emphasis added)).

**18.** In *Valdez,* the Court distinguished its decision in *Summers* on the grounds that the "challenged conduct clearly implicates a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards." 56 F.3d at 1180. The crucial issue was not the presence of safety concerns, but whether government's decision necessitated balancing those concerns against others more directly related to public policy. Thus, the Park Service's decision was protected because it had to "make a public policy determination of which dangers are obvious and which dangers merit the special focus of a warning brochure or pamphlet." *Id.*

source allocation, visitor safety and scenic preservation"); *Zumwalt v. United States*, 928 F.2d 951 (10th Cir.1991) (National Park Service's failure to warn about hazards along hiking trails at Pinnacles National Monument).

Indeed, many of the cases reaching this result involve claims similar to those made here: that the government (often the military) failed to warn about the dangers associated with toxins to which individuals were exposed on account of governmental activity. *See, e.g., Minns v. United States*, 155 F.3d 445, 452 (4th Cir.1998) (failure to give servicemen warnings about dangers of inoculations and exposure to pesticides imposed by military in preparation for first Gulf War); *Barnson v. United States*, 816 F.2d 549, 553–54 (10th Cir.1987) (failure to warn uranium miners about the risks associated with uranium exposure in the mines protected because based on public policy rather than medical considerations); *In re Consolidated U.S. Atmospheric Testing Litig.*, 820 F.2d 982 (9th Cir.1987) (failure to warn participants in atomic weapons testing program of potential health problems associated with exposure to radiation); *Cisco v. United States*, 768 F.2d at 789–90 (holding that in "deciding not to warn [plaintiff] about the contaminated landfill ... the EPA made political, social, and economic judgments pursuant to its grant of authority"); *Gould*, 2002 WL 27834, at *17–*19 (failure to warn residents living near government-owned battery manufacturing plant of their potential exposure to harmful materials); *Vallier v. Jet Propulsion Lab.*, 120 F.Supp.2d 887, 914–15 (C.D.Cal.2000) (failure to warn about drinking water contaminated by governmental activity covered by the exception because it "involves a balancing of public safety concerns not present in the simple decision of whether to post adequate speed limit signs").

One especially illustrative case is *Maas v. United States*, 94 F.3d 291 (7th Cir. 1996), in which the Seventh Circuit held that the Air Force's decision not to warn a group of servicemen that they faced a significant risk of developing cancer as a result of their exposure to radioactive material during a sensitive military operation was shielded from liability. While the safety of the men was obviously at issue, the Court found that the warning they demanded called for delicate judgment and discretion, as it would have required the military to make a number of non-ministerial decisions regarding the form, scope, and content of the notice. "In ascertaining the need for a warning and its cost, and in determining the group to be alerted, as well as the content and procedure of such notice, the government would balance safety with economic concerns. Deciding whether health risks justify the cost of a notification program, and balancing the cost and the effectiveness of a type of warning, are discretionary decisions covered by § 2680(a)." *Id.* at 297. Giving notice, then, is not always simple, and in such complex cases the decision whether to do so will often involve considerations of the social, economic, and political factors protected by the discretionary function exception.

■■■■ Despite the sheer number and variety of the cases cited above, the Court believes that they reveal at least two clear themes. First, as stated by the Third Circuit in *Cestonaro*, "a decision (or non-decision) must be reasonably related to a policy consideration to fall under the discretionary function exception." 211 F.3d at 760. Immunity is thus appropriate where the nature of the government's choice demanded that public safety or health concerns be balanced against the social, economic, and political considerations that lie at the heart of the exception.

A second point is that the more complex and politically sensitive the decision and the more it is connected to uniquely governmental functions, such as providing for the common defense, conducting foreign policy, or regulating private conduct (as opposed to governmental actions taken merely as an owner of land), the more likely that the decision will be shielded as a discretionary function. *See Maalouf,* 208 F.Supp.2d at 36–37 (distinguishing decisions made by a government body as a mere landowner from those made as a result of "policy-making duties" uniquely governmental in nature); *Smith v. United States,* 546 F.2d 872, 877 (10th Cir.1976) (focusing specifically on government's role as a landowner in holding that failure to post warning signs around thermal pools was not protected); *cf. Cope,* 45 F.3d at 448 (noting that the exception applies to "discretionary actions of greater significance").

Applying these considerations to the present case, the Court concludes that the Army's decision not to issue warnings at the time that it buried the munitions at AUES implicates the very kind of policy judgments that warrant protection under § 2680(a). The choices made at AUES went directly to the military's core mission: developing, testing, and storing weapons of war. Disclosing the scope of chemical munitions burials could have revealed sensitive information concerning the nature and scope of the Army's gas warfare program during a critical period in that program's existence. It could have created unwarranted fears that might have undermined the military's ability to use private land for important research in the future. On the other hand, the government may have been concerned that failing to issue such warnings could adversely affect human or environmental health.

Striking the appropriate balance between such competing concerns of secrecy and safety, national security and public health, is the essence of governmental policy decision-making, and protecting government officials in carrying out such difficult choices is the purpose of the discretionary function exception. This is true even if with the benefit of hindsight, one might conclude that the government's decision was not a wise one, for the exception is designed to preclude judicial second-guessing of such core military policy judgments. *Accord Boyle v. United Techs. Corp.,* 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (discretionary function exception allows the military to balance the "trade-off between greater safety and greater combat effectiveness" without being second guessed by the. courts); *Black Hills Aviation, Inc. v. United States,* 34 F.3d 968, 976 (10th Cir.1994).[19]

---

**19.** In reaching this conclusion, the Court is not suggesting that all decisions made by the military are automatically protected by the discretionary function exception. Rather, the decisive factor here is that the discretionary judgment challenged by claimants is directly related to one of the Army's critical responsibilities: defending the country during wartime by developing and testing new weapons to be used on the battlefield. As such, these cases are different from *Gotha v. United States,* on which claimants rely. (Claimants' Reply Mem. at 4 & n.3.) There, the Third Circuit held that the Navy's failure to provide safe access to an office trailer on one of its ranges (by installing a handrail and adequate lighting) did not fall within the discretionary function exception. The Court observed that such actions are "hardly the stuff that implicates the Navy's mission to provide a defense to the Nation or to enforce its diplomatic efforts.... This case is not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." 115 F.3d at 181. The present cases, in contrast, lie at the opposite end of this spectrum, implicating not the prosaic decisions made by the Army as an admin-

In centering on the government's obligation to issue warnings about environmental hazards generated in service of wartime exigencies, the present cases resemble *Gould Electronics*. That case concerned waste discharge from a government plant that produced nickel-cadmium batteries needed for weapons used during the Korean War. Like claimants here, the plaintiffs in *Gould* brought an FTCA claim assailing the government's failure to warn area residents about this discharge. The Court held that given the military exigencies involved, these claims were barred by the discretionary function exception: "where a manufacturing plant was producing a vital war-time weapons component and where speed and efficiency were of the essence, decisions relating to the release of information concerning what is discharged from the plant can be characterized as a policy judgment reflecting one aspect of the Army's decision on how best to design and operate the facility." 2002 WL 27834, at *18. In such cases, the failure to warn cannot readily be disentangled from the choice to create the hazard in the first place. Indeed, as in *Gould*, the Army's decision not to mark the locations of the weapons that were buried at AUES was intimately connected to its decisions about how to operate a facility vital to an ongoing war effort and to dispose of the potentially toxic materials developed and tested there. And, for this reason, the Court agrees with *Gould*'s conclusion that such decisions are susceptible to policy analysis, because they implicate "safety, economic, efficiency, and military" concerns. *Id.*

In the present case, moreover, it does not appear that the Army had any specific knowledge of the dangers associated with burying gas munitions, especially insofar as those weapons were not leaking at the time they were buried. While the *Bulletin* does acknowledge that a leaky gas shell, even once buried, could be a "source of danger for some time after," this vague observation hardly establishes that the Army was aware of the potential harms that ultimately appear to have sprung from its decisions: long-term soil contamination and the corresponding dangers that such contamination poses to human and environmental health.[20] As such, there is no indication that during the World War I era, the military either disregarded any established hazards by burying chemical weapons or that it withheld specific known risks from the public by not announcing what it had interred. Under these circumstances, decisions about what kind of warning to issue, what to say about the dangers that could result from the burials, would have involved an additional element of discretion, because the safety issues that the military would have had to consider were, at best, speculative and ill-defined. These are just the kinds of concerns discussed in *Maas,* and that led the Seventh Circuit to hold that the government's failure to warn was protected by the exception. *See* 94 F.3d at 297.

---

istrator or landowner, but rather fundamental choices about how best to test and discard experimental munitions developed during wartime.

20. Further, whatever they indicate about the military's knowledge of the safety risks of burying weapons, neither the *Bulletin* nor the *Manual* supports the proposition that the government's decision not to warn was divorced from policy considerations. Indeed, they are entirely silent as to why the Army made the decisions that it did. At most they suggest that the government disregarded certain amorphous safety concerns in burying the munitions. However, as explained above, the discretionary function exception allows such sacrifices to be made, if they are made in service of other countervailing policy objectives. Nothing in these documents suggests that this was not the case here.

In a final effort to salvage their failure to warn allegations, claimants argue that the inapplicability of the discretionary function exception to these claims was settled by Judge Sporkin's decision in *Miller*. Obviously, the Court is not bound by *Miller*, and for the reasons just explained, it is unable to agree with that case's holding that "the Army's decision not to warn that it had buried munitions on private land is not the type of decision that involves social, economic, or policy considerations." 963 F.Supp. at 1241. However, an additional aspect of the *Miller* opinion requires further discussion. This is Judge Sporkin's finding that "there is evidence that the Army did mark and fence off some hazards left on the formerly leased properties," which finding led him to conclude that "the Army has already made a decision to warn. Its failure to effectuate that decision properly was not itself the product of a policy decision." *Id.* at 1241–42. For two independent reasons, this Court cannot accept that conclusion.

First, the factual predicate on which that conclusion depended does not appear to be correct. Judge Sporkin relied solely on a single sentence in the *Brief History*, which reports that after the War ended "[p]ermanent structures—including the shell pits, powder magazines, detonator house, and explosive service building on the Spalding property—were boarded up and enclosed with fences or barbed wire to prevent access." *Brief History*, at 37. This does not say, nor does it imply, that the Army posted any actual warning signs or markers alerting the public of buried chemical munitions at these boarded-up structures. Nor is there any such indication in the source document on which the *Brief History* relies. *See* Memorandum, Chief, Research Division, to Director, Chemical Warfare Service (Jan. 25, 1919).[21] (Claimants' Supp. Mem., Ex. 42.) As such, the finding in *Miller* that the Army "had already made a decision to warn" is not supported by the record. And, in the absence of evidence that the government had actually decided that warnings were necessary or appropriate, *Miller*'s legal conclusion (that those warnings therefore had to be effective and that the failure to make them so was not grounded in policy) collapses.

Second, even if the government did chose to fence off and mark the location of some of the shell pits, it does not follow that it was required to mark the location of all places where munitions were buried throughout the entire AUES campus. This is true both factually and legally. Factually, the Memorandum cited above makes clear that the shell pits in question were located on the Spalding property. The Spalding property was not owned by AU,[22] and thus was not necessarily part of the arrangements that existed between the University and the Army. Certainly, as it clear from its subject line, the Memorandum's sole focus was "Construction on the Spaulding Property," which suggests that the Army viewed the restoration issues on this parcel as being distinct from those on the AU campus itself. In any event, it would be improper to surmise that merely because the Army decided (for whatever reasons) to take certain steps with respect

---

21. Paragraph 5 of the Memorandum states: "We will have arranged by the time theses buildings are vacated to have any dangerous excavations enclosed with barbed wire, fences built where necessary, doors and windows boarded up, and the buildings left in such shape that it will be impossible for negligent persons to have an accident, and if such accidents occur it will be the result of the persons effected."

22. *See Brief History*, at 21 ("The pits were built both on university grounds and on adjacent property owned by Charles Spaulding.").

to the Spaulding property, it had thereby somehow *obligated* itself to warn the University about similar hazards on its property. There is simply no evidence that the decision to do the former in any way implied a binding decision to do the latter.[23]

*Miller's* conclusion is also legally flawed because it appears to rely on an outmoded distinction between "planning" and "operational" decisions. The animating idea in this section of *Miller* seems to be that while the Army's initial decision to warn may have been discretionary, the effectuation of that decision cannot be. In other words, once the government elects a particular course of conduct (such as deciding to issue warnings), any negligent action that occurs as that decision is implemented necessarily falls outside the discretionary

function exception. However, while this distinction once figured prominently in the discretionary function caselaw,[24] in more recent years it has been expressly rejected by both the Supreme Court and the D.C. Circuit. *See Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 (holding that there is nothing in the description of a discretionary act that "refers exclusively to policymaking or planning functions"); *Sloan v. U.S. Dep't of Housing and Urban Dev.*, 236 F.3d 756, 764 (D.C.Cir.2001); *Cope*, 45 F.3d at 449–50. As *Cope* makes clear, this sort of analysis loses sight of what really matters under Prong Two: whether the decision at issue (whether made in the course of planning a general operation or implementing a larger decision already made) involved considerations of public policy.[25] *See*

---

**23.** Moreover, the focus of the relevant section of the *Brief History* (as well as the underlying Memorandum) was how the Army planned to address actual *structures* that remained on the AUES property. The shell pits were addressed because they were actual buildings "of reinforced concrete construction, 15' × 15' × 15' high, inside dimensions, provided with wooden sliding cover and protected by a wooden barricade with roof." *Research Division Memorandum* (Claimants' Supp. Mem., Ex. 42.) Given this single-minded focus, the Memorandum's statement about "dangerous excavations" can only plausibly be read to refer to excavations associated with the buildings discussed. There is no indication that the Army contemplated fencing off the more informal locations where munitions may have been buried. As such, any decisions that were made with respect to permanent shell pits have little bearing on the government's obligation to warn about isolated weapons buried *outside of such structures*, or about the risks of soil contamination associated with such burial.

**24.** *See, e.g., Caplan v. United States*, 877 F.2d 1314, 1316 (6th Cir.1989); *Mandel v. United States*, 793 F.2d 964, 967–68 (8th Cir.1986).

**25.** Ironically, *Miller* relied on *Cope* in reaching its erroneous conclusion. It is true that *Cope*, which involved a traffic accident in Rock Creek Park, held that once the govern-

ment had put up a number of traffic signs on the road in question warning commuters of the dangers of driving there, it was precluded from arguing "that its failure to ensure that those steps are effective involves protected 'discretionary' decisions." 45 F.3d at 452. This statement does not support the broad principle that *Miller* appears to have read into it. Instead, *Cope* was rejecting the government's argument that its decision not to put up a sign regarding the nature of the road surface was based on aesthetic considerations. The Court found that argument implausible in light of the fact that numerous other signs had already been erected on the same stretch of road where the accident in question occurred. Thus, the Park Service had already decided "to manage the road in a manner more amenable to commuting through nature than communing with it," and the failure to add one more warning marker therefore could not have been based on a desire to preserve the aesthetic properties of the area. *Id.*

This certainly does not mean, however, what *Miller* suggests: that any time the government makes a policy decision to warn about one danger, its failure to effectively implement that policy by warning about all dangers thereby falls outside of the realm of discretion. Indeed, *Cope* itself explicitly rebuffed that suggestion:

*Minns,* 155 F.3d at 451–52 (holding that "decisions that take place in the administration of a policy decision are also protected—even if an abuse of discretion—so long as they are judgments based on policy considerations"); *Blakey v. U.S.S. Iowa,* 991 F.2d 148, 153 (4th Cir.1993).

For these reasons, the possibility that the Army actually provided warnings on the Spaulding property about certain munitions burial sites (which is far from clear) in no way forecloses the government's argument that its decision not to post warnings about others was based on considerations of public policy. And, as explained above, the Court is satisfied that just such

[W]e reject Cope's argument that the government's acts are not discretionary since they involve the 'implementation' of government policy. Cope argues that ... the 'implementation' or 'execution' of policy decisions—particularly with respect to warning the public about hazards resulting from negligence—is never protected under the exception. Cope's argument, however, is merely an effort to establish yet another in a long series of 'analytical frameworks' that the Supreme Court has rejected as an inappropriate means of addressing the discretionary function exemption. The mechanistic application of these frameworks encourages courts to avoid the proper analysis: Whether the nature of the decision involved the exercise of policy judgment.... Recognizing that the focus is on the nature of the decision, not on the semantic pigeonhole into which the action can be put, we decline to follow Cope's reading of the case law, focusing instead, as we are required, on whether the decision is 'fraught with' economic, political, or social judgments.

*Id.* at 449–50 (citations omitted).

Moreover, in a recent decision, the D.C. Circuit further undercut any argument that failing to adequately effectuate a decision to warn is necessarily nondiscretionary. In *Abdulwali v. Washington Metro. Area Transit Auth.,* 315 F.3d 302 (D.C.Cir.2002), a boy riding the Metro was killed when he fell onto the tracks after attempting to pass between cars on a moving train. His mother brought a negligence action, contending that, although

considerations explain the Army's silence about buried munitions during the World War I era. This conclusion leaves the question of whether the government's more recent activity in Spring Valley arose out of similar concerns.

**B.** *Actions and Omissions From 1986 until the Present*

With respect to the government's investigations of munitions-related contamination in Spring Valley, claimants' primary argument is that the failure to warn area residents of the dangers that were being uncovered is not protected by the discretionary function exception.[26] In advancing

the Transit Authority had placed signs warning passengers not to move between cars, these warning were inadequate. The D.C. Circuit held that this claim was barred because the Transit Authority's decisions constituted discretionary functions. Designing the signs "required judgments that were by their nature susceptible to policy analysis," requiring consideration of such factors as "safety, aesthetics, cost, and a desire to alert passengers to the danger of moving between cars without discouraging them from so moving during emergencies." *Id.* at 305. In addition to confirming that decisions implicating safety concerns are not categorically non-discretionary, *Abdulwali* suggests that even where the government has undertaken to issue warnings about particular safety risks, decisions about the scope and nature of those warnings may still implicate policy judgments and thus be immune from tort liability.

**26.** The Court does not read claimants' Supplemental Memorandum as arguing that decisions made by the government during its investigation and clean-up (other than its failure to warn) that may have impeded the ultimate discovery or remediation of contamination associated with buried munitions were not based on policy considerations. This implicit concession is wise, as there can be little doubt that governmental choices associated with running an environmental cleanup operation fall within the range of discretion protected by § 2680(a). *See Daigle,* 972 F.2d at 1541–42 (holding that EPA's decisions during CERCLA operations concerning "how to go

this argument, they focus on two events. The first is EPA's finding that one of the soil samples collected in March 1994 from the 4825 Glenbrook Road property showed heightened levels of arsenic. According to claimants, they were not informed of this result until February 1999. The second relevant piece of information that was allegedly withheld was the government's 1993 report revealing the discovery of two munitions pits adjacent to the 4825 property. (FTCA Claimants' Supp. Mem. at 11–12.) Claimants contend that because the government had previously made a decision to keep the community apprised of its investigation, its failure to disclose these findings cannot be justified on policy grounds. Indeed, say claimants, far from revealing what it had learned, the government acted as if all was well in Spring Valley, most prominently when the Corps issued its 1995 Record of Decision in connection with OSR FUDS, in which the Army concluded that no risks from hazardous substances threatened human or environmental health. (Claimants' Supp. Mem., Exs. 10–12)

Responding to these claims, the government contends, and the Court agrees, that choosing not to release this information implicates public policy considerations. With respect to the soil samples, EPA was confronted with a single elevated arsenic reading out of the seven samples it had collected. In deciding whether this infor-mation should be made public, the agency would have had to weigh several factors, including the reliability of the test, the significance of one unusual result, the possibility of unnecessarily alarming Spring Valley residents should the danger have ultimately proved unfounded, and whether further testing should be done before this data was revealed. Conducting this delicate balance is a matter that calls for discretion of the sort that the FTCA shields from judicial second-guessing. *See Daigle,* 972 F.2d at 1542–43 (Army's failure to disseminate information regarding hazards associated with toxic-waste cleanup suffused with policy considerations); *Wells,* 851 F.2d at 1476 (EPA's failure to warn residents of the dangers of lead pollution in their neighborhood was protected as a discretionary function); *Lockett v. United States,* 938 F.2d 630, 638–39 (6th Cir.1991) (EPA's inaction after discovering PCB contamination protected).

Similarly, with respect to the pits, while there were two shell pits ("Points of Interest" 22 & 23) identified in a Draft Field Sampling Plan prepared by the Corps in 1993 (U.S.Supp.Ex. 14, fig.2.7), no information existed at the time that the pits actually contained munitions.[27] As the Court observed in its previous Opinion, "the existence of munitions pits—which were constructed to test, not bury, explosives—does not necessarily indicate the presence of

about containing the spread of contamination before further damage could occur while still protecting public health touched on policy choices," such as the need to balance prompt cleanup and safety with the realities of finite resources and funding limitations); *cf. Wells,* 851 F.2d at 1476 (quoting *Cisco,* 768 F.2d at 789) ("Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes.").

27. The Plan identifies another Point of Interest (24) as a "probable pit." When this pit was finally located in 1998–99 on the property of the Korean Ambassador (4801 Glenbrook Road), it was found to actually contain buried munitions. Additionally, the search for this pit revealed the existence of another one, which straddles the Ambassador's property and the Loughlins' property. This pit was discovered in 2001. The government points out that once the actual locations of these sites were discovered (and the weapons found), remediation efforts coupled with public disclosure and involvement, commenced immediately. (U.S. Resp. at 46.)

buried contaminants." *Loughlin*, 230 F.Supp.2d at 41. Certainly, the Plan which claimants suggest was withheld from them does not indicate that weapons or other toxic materials were actually in the ground. As such, the Army's decision whether to announce this limited information, with its highly speculative relationship to actual risk, is subject to the same policy considerations that attended upon the EPA's decisions whether to go public with its soil test results.[28]

Moreover, the Court is wholly unpersuaded by claimants' suggestion that the government had in fact already decided to keep area residents informed about the details of the investigation, and therefore that the Army's failure to tell them about these discoveries can be understood only as a negligent failure to execute that earlier decision, rather than as independent acts of policy-related judgment. To begin, it is far from clear that the government actually made some kind of binding decision to issue detailed public updates regarding its investigation that would have covered the test results at issue here. The sole piece of evidence cited by claimants in support of this proposition is a series of press releases issued by the Corps in connection with OSR beginning in 1993. (Claimants' Supp. Mem., Ex. 13.) While these documents do suggest that the Army wished to communicate information to the public about the progress of its investiga-

tion, it reads far too much into them to argue that they demonstrate an official, irrevocable commitment to alert the public to every development in the search for buried munitions, or to every potential danger that was discovered. There is simply nothing in these press releases that describes, or even implies, a broad policy decision to disclose all subsequent developments, no matter how speculative or uncertain those developments may be.[29]

And even if the Army had made an initial decision to disclose the information it learned, it simply does not follow that such a decision would have necessarily eliminated the Army's discretion to keep private certain pieces of information based on the kinds of policy considerations described above. The fact that the government releases some information (whether because of prudence, beneficence, or any other reason) should not, and does not, preclude it from withholding other information based on other, seemingly more compelling policy considerations. Claimants have nothing beyond their own assertions to suggest that the delayed disclosure of the arsenic results (as well as the identification of the two, possibly empty, pits) were not separate choices entitled to be evaluated on their own terms.

The weakness of claimants' argument is not just factual. Indeed, the Court has already described (*supra*, footnote 25) the

---

28. At any rate, the suggestion that the government withheld this information seems overblown. For, while claimants contend that they never saw the Draft Plan, it does appear that the document was available to the public and could readily have been accessed and read by anyone concerned about what was going on in Spring Valley. (U.S. Resp. at 44–45, Supp. Ex. 16.)

29. Of course, even if the Corps' previous public statements could be construed as a final decision to release all information that it had, it must be remembered that the March 11 soil

samples were collected not by the Army, but rather by the EPA. (Indeed, the Corps had collected its own samples two days earlier, and there is nothing in this record to suggest that the results of those tests showed any contamination.) Claimants have offered no reason to think that the Corps' decisions about disclosure were intended to, or did, bind the EPA in choosing what aspects of *its* investigation should be make public. Nor do they point to any indication that EPA had adopted its own *ex ante* disclosure policy.

D.C. Circuit's rejection of the notion that once the government chooses to issue warnings, all subsidiary decisions implementing that decision—for example, the form, prominence, and overall quality of those warnings—are necessarily removed from the realm of discretionary functions. *See Abdulwali*, 315 F.3d at 305. The law is clear that an initial decision to warn does not preclude immunity for a subsequent failure to warn, at least as long as the government can show that the latter decision was reasonably related to the economic, social, and political considerations that drive the discretionary function exception. *See Cope*, 45 F.3d at 449–50. As explained above, the Court is satisfied that this showing has been made here.

## CONCLUSION

These cases present difficult issues of fact and law. While the Court is certainly sympathetic to the plight of the residents of Spring Valley, and is sensitive to the fears and disruptions that the government's actions have caused, its decision is constrained by the legal framework established by Congress, and cannot be based on the Court's independent judgment about whether the government has behaved commendably. Applying the relevant jurisprudence regarding the discretionary function exception, the Court finds that the United States is immune from suit. The government's motions to dismiss must therefore be granted.

Moreover, because the FTCA claims against the United States were the only federal claims in these cases, and the Court's jurisdiction over the non-federal claims is based the supplemental jurisdiction statute, the dismissal of the FTCA claims compels the Court to dismiss the remaining claims as well. *See* 28 U.S.C. § 1367(c)(3). This dismissal is without prejudice, and the non-federal claims may of course be refiled in Superior Court for the District of Columbia. *Cf. id.* at § 1367(d). An order accompanies this Memorandum Opinion.

## *ORDER*

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the United States' Motion to Dismiss based on the discretionary function exception [73–1] is **GRANTED**; it is

**FURTHER ORDERED** that all claims against the United States are **DISMISSED WITH PREJUDICE**; and it is

**FURTHER ORDERED** that all remaining claims are **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**